Rel: May 3, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0649), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2023-2024

-----------------------

### CR-20-0727

-----------------------

### Michael Anthony Powell

### v.

### State of Alabama

### Appeal from Shelby Circuit Court
### (CC-16-942)

COLE, Judge.

Michael Anthony Powell was convicted of capital murder for killing Tracy Algar during a first-degree robbery, a violation of § 13A-5-40(a)(2), Ala. Code 1975. The jury, after unanimously finding the existence of two aggravating circumstances -- that Powell had been previously convicted of a felony involving the use or threat of violence and that Powell was

under a sentence of imprisonment when he committed the capital murder -- recommended by a vote of 11 to 1 that Powell be sentenced to death. The trial court followed the jury's recommendation. This appeal, which is automatic in a case involving the death penalty, follows. See § 13A-5-53, Ala. Code 1975.

On appeal, Powell raises several arguments. His first argument -- that the State, during its rebuttal closing argument, "repeatedly and erroneously commented on [his] silence" -- requires this Court to reverse his capital-murder conviction and death sentence. (Powell's brief, p. 12.) To provide context to Powell's argument, we first set out the evidence presented at Powell's trial and detail the closing arguments made by counsel during the guilt phase of Powell's trial.

## Facts and Procedural History

At trial, the State's evidence established the following: Just before 11:00 a.m. on October 30, 2016, the Kirkland Chevron gas station on Route 31 in Alabaster was robbed. During that robbery, Tracy Algar, the store's clerk, was shot in the back of the head in the bathroom of the gas station. The gunshot wound caused Algar's death. Surveillance video from businesses around the gas station showed that, shortly before the

2

robbery and murder, a black male wearing a white shirt, black pants, and a black fedora hat left "The View" apartment complex on foot, walked northbound on Route 31 toward the gas station, and entered the gas station. Surveillance video from businesses around the gas station also showed that, after the time of the murder, the same black male left the gas station on foot, continued southbound on Route 31 toward The View, and entered the apartment complex. Sarah Knighten, who was driving on Route 31 at that time, also saw a black male wearing a white shirt, black pants, and a black fedora running southbound along Route 31.

At around 11:00 a.m. on October 30, 2016, Miranda Craig -- a registered nurse who frequented the gas station and who knew Algar -- pulled into the gas station to get gas. When the pump did not turn on, Craig went inside the gas station to look for Algar. Craig called for Algar, but she did not respond. Shortly after Craig entered the gas station to look for Algar, Johnny Lawson also entered the gas station. Eventually, Craig opened the bathroom door and found Algar dead on the floor. Craig and Lawson then went outside, and Craig called 911.

When law enforcement arrived at the gas station, they found Algar lying on the bathroom floor "with a large amount of blood … around her

3

face and head." Law enforcement also found an unopened pack of Newport cigarettes on the counter by the cash register along with a "no sale" receipt that was time-stamped "10:51 a.m."[1] When law enforcement had the owner of the gas station, Scott Kirkland, open the cash register, they found only coins in the register and, according to the accounting system for the gas station, there should have been around $265 in the register.

On November 1, 2016, law enforcement released to the public photos of a "person of interest," which were taken from the surveillance videos. Two employees who worked at The View apartment complex recognized Powell as the person of interest. Those employees knew Powell because he lived in an apartment at The View, and they contacted law-enforcement personnel and told them that they thought they knew who was in the photos. Knighten also contacted law enforcement to

---

[1]It was explained at trial that "[a] no sale button in a convenience store on that type of register … is where they can open the drawer up and it keeps a record of when that drawer was opened" and, normally, the employee who used the "no sale" button to open the register "would get a printout and you would initial it, gives us a reason why you opened the cash register up at that particular time." (R. 1330-31.) Further, it was explained that the time stamp on the "no sale" receipt is generated "by Chevron through the satellite. It is their system. So it is going to be spot on time." (R. 1333-34.)

report the man she saw running along Route 31 the day Algar was murdered. Later, law enforcement contacted Knighten and presented her with a photographic lineup to identify the person she saw running along Route 31. Knighten identified Powell as the person she had seen.

On November 4, 2016, law enforcement executed a search warrant on Powell's apartment at The View. During that search, officers found black pants, white shirts, and a grey fedora hat. Law enforcement also executed a search warrant at a home belonging to one of Powell's girlfriends and, in that home, they found a box of Winchester .380 ammunition inside a silver box -- the same brand and caliber as the shell casing found by law enforcement at the gas station.

After Powell was arrested and while he was incarcerated in the Shelby County jail, Powell telephoned one of his girlfriends and told her to find alibi witnesses who would say that he was in Andalusia the day Algar was murdered. While he was jail, Powell also convinced another inmate -- David Jackson -- to author a letter confessing to being an accessory to the murder. Powell had Jackson read that letter on a recorded jail telephone call. Jackson said that, for his work, Powell "gave

[him] two packs of cookies," "a tablespoon of coffee," and "one phone call."

(C. 404.) Jackson's "confession letter" provided as follows[2]:

"I <u>David Jackson</u> on <u>11th</u> December 2016 in Shelby Co. jail am stating this true fact of the matter that <u>Michael Powell</u> is completely and totally innocent and not guilty of the crimes and charges that he has been wrongly and falsely charged with, accused of and did not commit.

"I <u>David Jackson</u> was one of two individuals connected to this incident or crime sunday October 30th in Alabaster. The other defendant or individual is James Moore. He is a older man (Black) have known for over two years in alabaster. We purchased and used street drugs together from a friend of his called 'Boy.'

"On Saturday Oct. 29 Moore called me in Birmingham and said to come to Alabaster for a deal that he would pay me for.

"[Illegible] We met at the park Moore told me that he needed me to lookout for him while he got me some money from his old girlfriend (<u>Tracy</u>) at the Chevron gas station on first street. (<u>Tracey</u>) was going to give him the money and state that she had been Robbed.

"Moore stated tracy said that business would be slow Sunday morning at around 11:00 am.

"James Moore entered the building from the direction of the hotel. I come from the back left side walking close to the back of building. Moore entered the station and asked Tracey for a pack of newports. She placed the cigarettes on the counter. Moore left the Cigarettes on the counter and showed

---

[2]The "confession letter" has been reproduced here without any grammatical, punctuation, or capitalization corrections.

her his Cobra 380 pistol, took her into the restroom after I heard a shot inside Moor ran out of the Building and told me to be near the motel down the street. [Illegible]. He ran in the direction of the Shelby Baptist Hospital to get his Black sport utility vehicle. I ran behind the store and behind buildings to the back of the hotel where Moore picked me up on the street.

"He then proceeded to his friend 'Boy's' trailer off of Simmeville Rd. to purchase Crack and Methamphetamine. I also noticed Moore had Red spots on his white T shirt that appeared to be blood. He also wore a Black Kangol Hat with a white Kangaroo on it, Black boots, Black pants. Mooore drove back to the park, we smoked the Crack. He also gave me fifty dollars and a small package of Meth. Afterwards Moore and I hid the gun and left. I went back after I got my own car and moved the gun to another spot.

"Moore called me one day later 'Monday' to tell me that the gun was missing.

"On Monday night October 31 I saw on the news what Moore had did at the Chevron station. I kept silent.

"On the news friday November fourth I saw that they had wrongly arrested a innocent man for the crime that I was involved in.

"I called the alabaster police dept to try to explain that I knew who actually had committed the crime. I also was told that they had arrested the right man and was immediately hung up on.

"On tuesday November 8 I tried to talk to a dective but was instructed to 'leave it alone' I also was asked my phone number and a place that we could meet.

"In Birmingham I was met by two dectives one whom's name was Josh. They told me to leave it alone or I would not be saying anything else at all and that 'Nobody was going to save that "Smart Ass" "Big Mouth" "N[*****]."'

"I told the dectectives it was wrong they laughed saying that 'I bet that "n[*****]" will not file a lawsuit on us about this.'

"I apologized to Mr Powell for him being wrongly accused for something that I was involved in. I also told where to find Mr James Moore's gun. I refuse to speak to a dectective or D.A. after their mistakes and threats on my life and bodily harm. All I wish to say is that Michael Powell is a innocent man. I can prove this by my words.

"Please share this information with a firm or someone who can free Mr Powell and please stop these corrupt, Racist officers from framing a innocent, not guilty man with a crime that I was involved in october 30 in alabaster at the Chevron that also harmed Miss tracy.

"After his crimes made the news Mr Moore tried calling many times leaving messages instructing me to keep my mouth closed. He also stated that the alabaster police and detectives would not believe me if I told them. Mr Moore claims he has always worked for them and that he is also good friends with the district attorney and that explains why he never stays in jail long, no matter what he does. He told me that he has 2 pending charges ([illegible]/lying). This is the truth, the whole truth and I have nothing else to say about these wrongdoings, corruption, Racism and this terrible injustice done to a completely innocent man for actions and things that I and Mr James Moore are completely guilty for and of.

"Michael Powell is innocent ... Thank you ...

8

"I plan to be present at Michael Powells trial for his defense. As I stated I have nothing to say to dectives or the d.a. also I wish for a jury to hear my confession."

(C. 477-84.)

According to Jackson, he did not know it was Powell who had employed him to author the confession letter. Rather, Jackson said, he was led to believe that he was assisting an unknown-to-him person in writing a confession letter because the person could not physically do it. (C. 401.) Jackson said that he did not write his name in the version of the confession letter he wrote and, instead, he "drew a blank at the very beginning of it for [the unknown person] to fill his name in and [he] left a blank for the date and that's it." (C. 406.) Jackson said that, after he gave the letter back to Powell, he did not see it again until he was being interrogated by law enforcement at the jail. (C. 410.) Jackson said that he was "astonished" when he saw the letter with his name added to it. (C. 411.)

Finally, while he was in jail, Powell told a different inmate, Kelvin Hines, about several details of the murder that were not made known to the public, and Hines spoke to law enforcement about his conversations with Powell. (R. 2171.) According to Hines, Powell confronted him in the

9

jail about having "wrote [his] prosecutor," which resulted in Hines having to be moved out of the Shelby County jail. (R. 2172-73.) Hines said that Powell had talked to him about the "money problems" he was having before Algar's murder, about the type of hat he was wearing in the surveillance videos, about the evidence in the case, about how his nephew was going to claim that the box of .380 ammunition that police found was his, and about how the gas station would be an "easy spot for someone to rob or do whatever they were going to do if they wanted to do it" because it had only one functioning camera. (R. 2174-79.) Hines also said that Powell told him details about Algar's murder:

> "He was saying that his attorney had explained to him that they had blood droppings supposedly on his clothes or outside of the bathroom. He was saying there was no way that blood could have got out of the bathroom because of the way the door was cracked, the way the door was cracked and from the angle he was in, there is no way that that blood could have got out of the bathroom."

(R. 2179.) Hines said that Powell told him that "the victim panicked and made him panic," and that, although he did not admit to shooting Algar, he mentioned "her brains or something along the lines of that." (R. 2179.)

In his defense, Powell presented testimony from Tina Brown, who had seen the person-of-interest photos that law enforcement made public.

Brown said that she telephoned law enforcement because the person of interest looked like "a man that [she] see[s] walking on a regular basis." (R. 2275.) Brown said she's seen this person walking through her "neighborhood, at the stores, outside the neighborhood, and up and down [Route] 31." (R. 2275.) Brown said she continues to see this person walking around her neighborhood and last saw him walking three days before she testified at Powell's trial. (R. 2275.) Brown said that, although she called law enforcement to report that the person of interest looked like the man she sees walking around her neighborhood, no one returned her telephone call. (R. 2278.)

At the end of the guilt phase of Powell's trial, the parties presented closing arguments to the jury. The State, in its closing argument, addressed evidence that, it said, showed that Powell had murdered Algar, including clips from the surveillance videos. It also addressed evidence that Powell presented in his defense case and the importance of the David Jackson "confession" letter, which, it alleged, Powell had had Jackson write. (R. 2359-65.) The State also addressed Powell's missing .380 handgun -- the weapon the State alleged was used to shoot Algar -- as follows:

11

"Now, the gun disappeared. The silver box hidden under [Powell's girlfriend's] house, bullets in it matching the description of the bullets that were found and used to kill Tracy Algar. When he was caught, he began running to alibi after alibi. When that didn't seem to be working, he ran to David Jackson, scheming to move this and shift the blame."

(R. 2365-66.)

In his closing argument, Powell's counsel argued:

"Now, the judge has charged you that a defendant has a right to remain silent. Michael exercised his right to remain silent in this particular case. You swore that you would not hold that against him. That is what we are going to ask you to do right now. You heard the evidence. You heard things that are going on in this case, but we are going to ask you to not hold it against Michael Powell because he exercised his right to remain silent that we all have."

(R. 2369-70.) Powell's counsel then addressed the weaknesses in the State's evidence and questioned the usefulness of the surveillance videos that the State had presented to the jury. Powell's counsel also addressed the .380 ammunition and the lack of evidence linking Powell to the murder as follows:

"There is a .380 caliber Winchester spent shell found in the store after individuals went in the store and before the store was roped off, but they even checked that. No fingerprints, no DNA belonging to Michael Powell. They lifted fingerprints off of the silver box, no DNA, no fingerprint lifts belonging to Michael Powell. They lifted DNA and fingerprint lifts off of the live rounds that were in the box, no DNA, no fingerprint lifts connecting Michael Powell.

12

"There is doubt all over the place, DNA, ballistics, no gun. Misidentification problems."

(R. 2386-87.)

The State, in its rebuttal argument, addressed the missing gun, telling the jury: "You know there is only one person in this room who knows where the gun is. One person, he is sitting over there. That guy knows where the gun is." (R. 2393-94.) Powell's counsel objected to the State's argument, and the following exchange occurred outside the presence of the jury:

"[Prosecutor]: If I could. Your Honor --

"The Court: Can you finish the thought?

"[Prosecutor]: It is within the David Jackson letter that David Jackson told him where the gun is.

"The Court: You are afraid he is headed for comment on --

"[Powell's counsel]: It is not in the possession of --

"The Court: I think that is what the objection is, yes?

"[Powell's counsel]: Yes, sir.

"The Court: He hadn't finished his --

"[Powell's counsel]: I didn't want him to finish. I thought it was improper.

13

"The Court: Tell them what you are fixing to say.

"[Prosecutor]: The David Jackson letter says that David Jackson told him where the gun is. That is it, I am not going to say he didn't tell us or anything like that. I am not a first year prosecutor, but I appreciate the instruction.

"The Court: That bell hasn't been rung yet. I don't find that to be improper depending on what comes next of course. We will resume.

"(End of side-bar.)

"The Court: [Prosecutor], you may continue.

"[Prosecutor]: Thank you, Your Honor. <u>There is one man in this courtroom who knows where that gun is, one man and he is sitting right over there next to that jury box</u>. You remember that letter from David Jackson? I have one copy here. State's 1001. You have the original, State's Exhibit 223.

"[Powell's counsel]: I still renew my objection.

"The Court: Noted, overruled.

"[Prosecutor]: This letter, I am on page three for reference, 'I apologize to Mr. Powell for him wrongly -- for him being wrongly accused for something that I was involved in, I also told him where to find Mr. James Moore's gun.' That is what David Jackson said. That is what David Jackson copied from the defendant's letter. Do you remember him telling us about that?"

(R. 2394-96 (emphasis added).)

14

After the parties' closing arguments, the circuit court charged the jury. (R. 2421-64.) Thereafter, the circuit court dismissed the alternate jurors and the remaining jurors retired to deliberate. After its deliberations, the jury returned a verdict finding Powell guilty of capital murder. (R. 2492.) Powell's case then proceeded to the penalty phase. At the conclusion of the penalty phase, the jury unanimously found two aggravating circumstances to exist beyond a reasonable doubt, and it recommended by a vote of 11 to 1 that Powell be sentenced to death. The trial court followed the jury's recommendation.

<u>Standard of Review</u>

Rule 45A, Ala. R. App. P., currently provides:

> "In all cases in which the death penalty has been imposed, the Court of Criminal Appeals may, but shall not be obligated to, notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."

Recently, this Court explained that it would continue to review the entire record for plain error in all cases in which the death penalty has been imposed, but we made clear that our analysis on issues that are reviewed for plain error may not be as extensive as was our historical

practice. See Iervolino v. State, [Ms. CR-21-0283, August 18, 2023] ___

So. 3d ___ (Ala. Crim. App. 2023).

In conducting plain-error review, we apply the following standard:

" 'The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal.' Hall v. State, 820 So. 2d 113, 121 (Ala. Crim. App. 1999), aff'd, 820 So. 2d 152 (Ala. 2001). Plain error is 'error that is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.' Ex parte Trawick, 698 So. 2d 162, 167 (Ala. 1997), modified on other grounds, Ex parte Wood, 715 So. 2d 819 (Ala. 1998). 'To rise to the level of plain error, the claimed error must not only seriously affect a defendant's "substantial rights," but it must also have an unfair prejudicial impact on the jury's deliberations.' Hyde v. State, 778 So. 2d 199, 209 (Ala. Crim. App. 1998), aff'd, 778 So. 2d 237 (Ala. 2000). 'The plain error standard applies only where a particularly egregious error occurred at trial and that error has or probably has substantially prejudiced the defendant.' Ex parte Trawick, 698 So. 2d at 167. '[P]lain error must be obvious on the face of the record. A silent record, that is a record that on its face contains no evidence to support the alleged error, does not establish an obvious error.' Ex parte Walker, 972 So. 2d 737, 753 (Ala. 2007). Thus, '[u]nder the plain-error standard, the appellant must establish that an obvious, indisputable error occurred, and he must establish that the error adversely affected the outcome of the trial.' Wilson v. State, 142 So. 3d 732, 751 (Ala. Crim. App. 2010). '[T]he plain error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." ' United States v. Young, 470 U.S. 1, 15, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n.14, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982))."

DeBlase v. State, 294 So. 3d 154, 182-83 (Ala. Crim. App. 2018).

Discussion

I.

As set out above, Powell first argues that, during its rebuttal closing argument, the State "repeatedly and erroneously commented on [his] silence." (Powell's brief, p. 12.) The State, on the other hand, argues that the complained-of comment was proper rebuttal, was not a comment on Powell's failure to testify, and that "no jury would naturally and necessarily take it to be a comment on Powell's failure to testify." (State's brief, pp. 13-14.) We agree with Powell.

Both the United States Constitution and the Alabama Constitution protect the right of every person to be free from being compelled to give evidence against themselves. See Art. I, § 6, Ala. Const. 2022, and U.S. Const. amend. V. The Alabama Supreme Court has held that courts "must carefully guard against a violation of a defendant's constitutional right not to testify." Ex parte Williams, 461 So. 2d 852, 853 (Ala. 1984) (citing Whitt v. State, 370 So. 2d 736, 739 (Ala. 1979)). This Court, citing and quoting decisions from the Alabama Supreme Court, has provided

the following framework to be used to determine whether the State has

impermissibly commented on a defendant's right not to testify:

> """'Comments by a prosecutor on a defendant's failure to testify are highly prejudicial and harmful, and courts must carefully guard against a violation of a defendant's constitutional right not to testify. Whitt[ v. State, 370 So. 2d 736] at 739 [(Ala. 1979)]; Ex parte Williams, 461 So. 2d 852, 853 (Ala. 1984); see Ex parte Purser, 607 So. 2d 301 (Ala. 1992). This Court has held that comments by a prosecutor that a jury may possibly take as a reference to the defendant's failure to testify violate Art. I, § 6, of the Alabama Constitution of 1901. Ex parte Land, 678 So. 2d 224 (Ala.), cert. denied, 519 U.S. 933, 117 S. Ct. 308, 136 L. Ed. 2d 224 (1996); Ex parte McWilliams, 640 So. 2d 1015 (Ala. 1993); Ex parte Wilson, [571 So. 2d 1251 (Ala. 1990)]; Ex parte Tucker, 454 So. 2d 552 (Ala. 1984); Beecher v. State, 294 Ala. 674, 320 So. 2d 727 (1975). Additionally, the Fifth and Fourteenth Amendments of the United States Constitution may be violated if the prosecutor comments upon the accused's silence. Griffin v. California, 380 U.S. 609, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965); Ex parte Land, supra; Ex parte Wilson, supra. Under federal law, a comment is improper if it was """manifestly intended or was of such a character that a jury would naturally

and necessarily take it to be a comment on the failure of the accused to testify."'" United States v. Herring, 955 F.2d 703, 709 (11th Cir.), cert. denied, 506 U.S. 927, 113 S. Ct. 353, 121 L. Ed. 2d 267 (1992) (citations omitted); Marsden v. Moore, 847 F.2d 1536, 1547 (11th Cir.), cert. denied, 488 U.S. 983, 109 S. Ct. 534, 102 L. Ed. 2d 566 (1988); United States v. Betancourt, 734 F.2d 750, 758 (11th Cir.), cert. denied, 469 U.S. 1021, 105 S. Ct. 440, 83 L. Ed. 2d 365 (1984). The federal courts characterize comments as either direct or indirect, and, in either case, hold that an improper comment may not always mandate reversal.

"'"'Consistent with this reasoning, Alabama law distinguishes direct comments from indirect comments and establishes that a direct comment on the defendant's failure to testify mandates the reversal of the defendant's conviction, if the trial court failed to promptly cure that comment. Whitt v. State, supra; Ex parte Yarber, [375 So. 2d 1231 (Ala. 1979)]; Ex parte Williams, supra; Ex parte Wilson, supra. On the other hand, "covert," or indirect, comments are construed against the defendant, based upon the literal construction of Ala. Code 1975, § 12-21-220, which created the "virtual identification doctrine." Ex parte Yarber, 375 So. 2d at 1234. Thus, in a case in which there has been only an

19

indirect reference to a defendant's failure to testify, in order for the comment to constitute reversible error, there must have been a virtual identification of the defendant as the person who did not become a witness. Ex parte Yarber, 375 So. 2d at 1234; Ex parte Williams, supra; Ex parte Wilson, supra; Ex parte Purser, supra. A virtual identification will not exist where the prosecutor's comments were directed toward the fact that the State's evidence was uncontradicted, or had not been denied. See Beecher v. State, 294 Ala. 674, 682, 320 So. 2d 727, 734 (1975); Ex parte Williams, supra; Ex parte Purser, supra. Yet, in such circumstances, it becomes important to know whether the defendant alone could have provided the missing evidence.

"'"'A challenged comment of a prosecutor made during ... arguments must be viewed in the context of the evidence presented in the case and the entire ... arguments made to the jury -- both defense counsel's and the prosecutor's. Ex parte Land, supra; Windsor v. State, 683 So. 2d 1021, 1023 (Ala. 1994); Ex parte Musgrove, 638 So. 2d 1360, 1368 (Ala.1993), cert. denied, 513 U.S. 845, 115 S. Ct. 136, 130 L. Ed. 2d 78 (1994)."

"'"Ex parte Brooks, 695 So. 2d 184, 188-89 (Ala.) (footnotes omitted), cert. denied, 522 U.S. 893, 118

S. Ct. 233, 139 L. Ed. 2d 164 (1997), quoted in <u>Ex parte Clark</u>, 728 So. 2d 1126, 1130-31 (Ala. 1998).

"'"In <u>United States v. Knowles</u>, 66 F.3d 1146 (11th Cir. 1995), cert. denied, 517 U.S. 1149, 116 S. Ct. 1449, 134 L. Ed. 2d 568 (1996), more specifically addressing the alternative criteria for a comment to be improper -- the comment was (1) manifestly intended to be a comment on the defendant's failure to testify or (2) of such character that the jury would have naturally and necessarily taken it to be a comment on the defendant's failure to testify -- the court stated:

"'"'"The question is not whether the jury possibly or even probably would view the remark in this manner, but whether the jury <u>necessarily</u> would have done so." [<u>United States v. Swindall</u>, 971 F.2d 1531, 1552 (11th Cir. 1992), cert. denied, 510 U.S. 1040, 114 S. Ct. 683, 126 L. Ed. 2d 650 ... (1994) (citations omitted) (emphasis in <u>Swindall</u>).] "The defendant bears the burden of establishing the existence of one of the two criteria." [<u>United States v. Muscatell</u>, 42 F.3d 627, 632 (11th Cir.), cert. denied, 515 U.S. 1162, 115 S. Ct. 2617, 132 L. Ed. 2d 859 ... (1995).] The comment must be examined in context, in order to evaluate the prosecutor's motive and to discern the impact of the statement. [Id.]"'

"'"66 F.3d at 1163."'

"<u>Smith v. State</u>, 797 So. 2d 503, 539-41 (Ala. Crim. App. 2000) (quoting <u>Thomas v. State</u>, 824 So. 2d 1, 21-23 (Ala. Crim. App.

1999), overruled on other grounds by Ex parte Carter, 889 So. 2d 528 (Ala. 2004))."

Smith v. State, [Ms. CR-17-1014, Sept. 2, 2022] ___ So. 3d ___, ___ (Ala. Crim. App. 2022) (emphasis added). In short, this Court must first determine whether the comment in question was either a direct comment or an indirect comment on Powell's failure to testify.

As set out above, during its rebuttal closing argument, the State told the jury: "You know there is only one person in this room who knows where the gun is. One person, he is sitting over there. That guy knows where the gun is." (R. 2393-94.) Powell objected to the prosecutor's comment, and after the court overruled his objection, the prosecutor continued: "There is one man in this courtroom who knows where that gun is, one man and he is sitting right over there next to that jury box." (R. 2395.)

These comments are nearly identical to the comment made by the prosecutor in Whitt v. State, 370 So. 2d 736 (Ala. 1979), which the Alabama Supreme Court held was a direct comment on the defendant's failure to testify and, because the circuit court failed to promptly remedy the prejudice caused by the comment, constituted reversible error.

"In <u>Whitt</u>, supra, the defendant was indicted for first degree murder arising out of a fatality in an automobile collision. He was convicted of second degree murder and the conviction was affirmed by the Court of Criminal Appeals. This Court reversed, however, finding that the district attorney's argument to the jury was an impermissible comment on the defendant's failure to testify. In <u>Whitt</u>, none of the closing arguments appeared in the record except the statements objected to by counsel, including the comment regarding the defendant's failure to testify: '<u>The only person alive today that knows what happened out there that night is sitting right there</u>.' The defendant promptly objected to this remark and made a motion for mistrial.

"We stated in <u>Whitt</u>:

" 'The comment "The only person alive today that knows what happened out there that night is sitting right there" is almost identical to the comment "No one took the stand to deny it" held to be a direct comment on the defendant's failure to testify and held to be reversible error in <u>Beecher</u> [v. State], 294 Ala. 674, 320 So. 2d 727 (1975) (per Justice Embry). The comment is very close to the comment made in <u>Warren v. State</u>, 292 Ala. 71, 288 So. 2d 826 (1973). There, this Court held (per Justice McCall) that the argument "The only one that said he didn't sell it [marijuana] was the little brother" was also a direct comment on the failure of the defendant to testify and constituted reversible error. It is thus that we must conclude, based on the holding and rationale of those two cases, that the comment by the district attorney in this case was a direct comment on the failure of the defendant to testify and constituted error to reverse.'

"370 So. 2d at 738."

23

Ex parte Wilson, 571 So. 2d 1251, 1261-62 (Ala. 1990) (emphasis added).

So, just as in Whitt, supra, Beecher v. State, 294 Ala. 674, 320 So. 2d 727

(1975), and Warren v. State, 229 Ala. 71, 288 So. 2d 826 (1973), the

prosecutor's comment in this case -- that "there is only one person in this

room who knows where the gun is" and that he is "sitting right over

there" -- is clearly a direct comment on Powell's failure to testify at trial.

The State, in its brief on appeal, says that "no jury would naturally

and necessarily take [the prosecutor's comment] to be a comment on

Powell's failure to testify," claiming that the prosecutor's comment "on

Powell's knowledge of the gun was not commentary on his failure to

testify, but rather, was a refutation of defense counsel's argument that

the State had the wrong person." (State's brief, pp. 14-15.) But when

Powell objected to the prosecutor's comment at trial, the prosecutor

responded differently, arguing that the comment was appropriate

because "[i]t is within the David Jackson letter that David Jackson told

him where the gun is." (R. 2394.) The State on appeal tries to tie its

"wrong-person" argument to the prosecutor's argument in the circuit

court by saying that, "if Powell told Jackson about the murder weapon

for Jackson to include in the letter, then Powell had knowledge of the

24

murder weapon, thereby supporting the conclusion that the State had not tried the wrong person." (State's brief, pp. 15-16.) Under either theory, however, the prosecutor's comment was still an impermissible <u>direct</u> reference to Powell's failure to explain where the gun is, as Powell is the only person who could have testified as to the whereabouts of the gun. This is precisely the type of comment that is forbidden under the Constitution.

Although we recognize that "[a] prosecutor has the latitude to comment on the fact that the State's evidence is uncontradicted or has not been denied," we also recognize that "a prosecutor may not make comments that step over the line drawn by the right of a defendant not to testify at trial." <u>Ex parte Williams</u>, 461 So. 2d at 853 (citing <u>Beecher</u>, 294 Ala. at 682, 320 So. 2d at 734). The prosecutor's comment in this case crossed that line, requiring this Court to reverse Powell's capital-murder conviction and death sentence and to remand this case to the circuit court for further proceedings.

Although the State's direct comment on Powell's right not to testify requires this Court to reverse Powell's capital-murder conviction and death sentence, this Court, in the interest of judicial economy and

efficiency, also addresses some of the other issues that Powell raises on appeal.

## II.

We start with Powell's arguments that the circuit court erred when it allowed the State to present Jackson's deposition testimony at his trial because the deposition was taken outside the presence of a judge and because, he says, it was admitted at his trial when he did not have "an adequate prior opportunity to cross-examine the witness." (Powell's brief, p. 18.) Powell's arguments are without merit.

The taking of a deposition in a criminal proceeding is governed by Rule 16.6(a), Ala. R. Crim. P., and § 12-21-264, Ala. Code 1975. Rule 16.6(a) makes it clear that depositions are permitted in criminal cases "[w]henever, due to the exceptional circumstances of the case, it is in the interest of justice that the testimony of a prospective witness be taken and preserved for use at trial." Further, § 12-21-264(b), Ala. Code 1975, states that such depositions "shall be taken before the judge in the court's chambers or at another suitable location as the court may direct and shall be conducted in the presence of the district attorney or assistant district attorney, the defendant and his or her attorney, and any other persons

as the court in its discretion may permit, taking into consideration the welfare and well-being of the victim or witness." And Rule 16.6(e) allows either party to use, at trial,

> "a part or all of a deposition, so far as otherwise admissible under the Alabama Rules of Evidence, may be used as substantive evidence <u>if the witness is unable to be present or to testify at the hearing because of death</u> or mental illness or infirmity, or is absent from the hearing and the proponent of the statement has been unable to procure the witness's attendance by process or other reasonable means, or the witness gives testimony at the trial or hearing inconsistent with that witness's deposition. Any deposition may also be used by any party for the purpose of contradicting or impeaching the testimony of the deponent as a witness. If only a part of a deposition is offered in evidence by a party, an adverse party may require the offering of all of it that is relevant to the part offered and any party may offer other parts."

(Emphasis added). What is more, Rule 16.6(f), Ala. R. Crim. P., requires that "[o]bjections to deposition testimony or evidence or parts thereof and the grounds for the objection shall be stated at the time of the taking of the deposition." Powell raises two arguments concerning Jackson's deposition.

First, Powell argues that Jackson's deposition does not comply with § 12-21-264, Ala. Code 1975, because it was taken outside the presence of a judge. Although Powell is correct, the judge's absence here was

27

invited by Powell. <u>See</u> <u>Albarran v. State</u>, 96 So. 3d 131, 167 (Ala. Crim. App. 2011) (holding that a defendant cannot invite error and then predicate a reversal on the error he or she invited).

Indeed, before the parties took Jackson's deposition, Powell's counsel objected to the taking of the deposition based on having had inadequate time to prepare to cross-examine Jackson. After the parties made their arguments, the following exchange occurred:

"The Court: Do y'all need me in here?

"[Prosecutor]: Judge, the State does not. This is a deposition and a judge is not normally present but I understand that you would probably be on standby if we do need you.

"The Court: [Defense counsel], I don't mind staying in here.

"[Prosecutor]: Whatever y'all think.

"The Court: I mean, you know, generally something that I may at the preliminary hearing anyway if he was to be available but --

"[Powell's counsel]: Let me say my client is entitled to a jury trial. This proceeding is not in front of a jury. You know, we just object on the record and --

"The Court: I note your objection. I mean --

"[Powell's counsel]: Leave it at that.

"The Court: And I don't think -- and I think that anything that's taken down can be redacted at some point in time if there's something that is obviously, that's not admissible.  It can be redacted or it can even be stricken, the entire deposition can.

"So I will ... allow y'all to proceed, but I will if y'all want me to sit in here, but I will be more than happy to do that. So I will allow y'all to proceed with the deposition.

"[Powell's counsel]: That's fine.  You are overruling our objections, right?

"The Court:  Overruling, yes, sir.

"[Prosecutor]: The State defers to the Court on the matter of whether or not you want to be in here.  This is a deposition where a judge is not normally present but whatever you think, Judge.

"The Court: If y'all need me, let me know.

"[Powell's counsel]: <u>Defense does not require the Court</u>.

"The Court: I will step out. If y'all need me, I will be down the hall.  All right.  We will get the court reporter to swear Mr. Jackson in."

(C. 387-89 (emphasis added).)

So, although the judge was not present when Jackson's deposition was taken, the judge absented himself from the deposition only after Powell's counsel told the judge that he did "not require" the judge to be

present.[3]  Powell cannot now argue that his own voluntary conduct requires reversal of this case or that the judge's absence from the deposition prejudiced him.  What is more, although invited error in death-penalty cases can rise to the level of plain error, and although, as explained above, this Court still examines death-penalty cases for plain error, we do not find that the invited error here rises to the level of plain error.  Thus, Powell's argument does not entitle him to any relief.

Second, Powell argues that the circuit court erred when it admitted Jackson's deposition because, he says, his attorneys were not given an adequate opportunity to "effectively" cross-examine Jackson because the deposition was scheduled "just days after their appointment."  (Powell's brief, p. 21.)  To provide context to Powell's argument on appeal, we set out some additional procedural history of Powell's case.

On October 30, 2016, the circuit court appointed Mickey Johnson to represent Powell at a 72-hour hearing, and, at that time, Johnson made

---

[3]After Jackson's deposition, the State moved the trial court to enter a pretrial ruling as to the admissibility of Jackson's deposition testimony at Powell's trial.  During that hearing, Powell objected to the admission of Jackson's deposition at trial on the basis that it was not done in front of a judge in violation of § 12-21-264(b), Ala. Code 1975.  (R. 232-33.)  At the time Powell raised this argument, however, he had already invited any error in the judge's not attending the deposition.

a demand for a preliminary hearing. (C. 34.) On November 17, 2016, before a preliminary hearing was held, however, Powell was indicted for capital murder. (C. 26-27.) On November 21, 2016, Powell's case was set for arraignment. (C. 28.) At the time that his arraignment was set, the circuit court appointed Victor Portella as Johnson's co-counsel. (C. 28, 30.) Mickey Johnson moved to withdraw from representing Powell on December 8, 2016 (C. 34), and the circuit court granted his motion the next day. (C. 36.)

On December 9, 2016, the circuit court appointed Gary Young to represent Powell. (C. 37.) Thereafter, on December 14, 2016, Portella moved to withdraw from representing Powell. (C. 38-39.) Two days later, Young moved to withdraw from representing Powell, citing a "potential conflict." (C. 40.) The circuit court granted Young's motion the same day he filed it. (C. 42.) Immediately after granting Young's motion, on December 16, 2016, the circuit court appointed Everett Wess to represent Powell (C. 43), and it issued an order setting Powell's arraignment for December 21, 2016 (C. 44). The circuit court granted Portella's motion to withdraw on December 21, 2016. (C. 53.)

On December 16, 2016, the State moved to depose David Jackson at 9:00 a.m., on December 27, 2016. (C. 45.) On December 20, 2016, Wess moved the circuit court to appoint Kittren Walker as co-counsel, and the circuit court granted that motion (C. 51, 54). Thereafter, Wess and Walker remained as Powell's counsel throughout the trial-court proceedings.

On December 21, 2016, the circuit court arraigned Powell, and after Powell pleaded not guilty and not guilty by reason of mental disease or defect, the circuit court noted that there was a pending notice of deposition and asked the parties to explain the notice. (R. 6-7.) At that time, the State explained that it had originally noticed the deposition "of an individual who may have or who we believe does have significant information about this case" for December 27, 2016. (R. 7.) But, the State explained, it had learned that there was a scheduling conflict on that date and proposed that the deposition take place on December 29, 2016. Powell's counsel told the circuit court that he had "[n]o objection at this point," but he qualified his lack of objection at that time "to reserve the right to object in the event we come up with an objection between now and then." (R. 7, 9.) So, the circuit court granted the State's motion "as

32

it relates to the deposition, the taking of the deposition of David Carson Jackson as I do find an adequate factual basis recited in the motion and that he is alleged to be an indispensable and critical witness in these cases." (R. 8.)

On December 29, 2016, the parties appeared in court for Jackson's deposition. Before taking Jackson's deposition, Powell's counsel objected as follows:

> "Just for the record, we do object to the deposition being taken. I note for the record that I was appointed on this case December the 16th of 2016. My co-counsel, Kitt Walker, was appointed to this case December the 21st of 2016. We've gone through the Christmas holidays and we are here on December the 29th of 2016 and we have received some discovery, although I note I don't believe that we've received all of the discovery that would be due in this case in the end.

> "My client, you know, these two cases are the obstruction of justice case and tampering with evidence case. We have a witness here, Mr. Davis Jackson -- David Jackson. My client is Michael Powell who is also charged with a capital murder case and, you know, he's subject to the death penalty or life without the possibility of parole. This is a very serious charge, very serious case. Death is different.

> "....

> "We just want to object for the record. ... We will say that this deposition violates my client's Sixth Amendment right to adequate counsel because we have recently been appointed to this case as noted before.

"He is unable to adequately confront the witnesses as a result of this deposition happening in a short period of time when we've come onto these cases[.]"

(C. 377-79.) Powell's counsel added:

"And in order for it to be said that Mr. Powell has had an adequate opportunity to confront the witness in this particular case, we have not had an adequate opportunity to investigate this particular witness so how can we, how can it be said two years from now that Mr. Powell had an adequate opportunity to confront this witness when we have not had an opportunity to investigate this witness.

"We can't, we can't cross-examine this witness regarding any of his background, regarding any of his history. He's obviously a racist. There is a statement that was taken by the District Attorney's Office. You know, he said some very disparaging things about African Americans. There's a -- called them N words, called us N words and all those kinds of things.

"We need an opportunity to investigate this man, whether or not he's a member of the KKK or any other white supremacist groups, whether or not --

"....

"His criminal history and a number of other things. It can't be said that Mr. Powell has had an adequate opportunity to confront this witness when we've not had an adequate opportunity to investigate this witness."

(C. 384-85.)

In response, the State argued that it had given Powell "copies of all of the interviews and we have provided all of the phone calls, videotapes,

and documents related to this. ... So they do have, as far as I can tell, complete discovery in this." (C. 386.) Thereafter, the district-court judge overruled Powell's objection to the taking of Jackson's deposition and the parties deposed Jackson.

During Jackson's deposition, Powell's counsel took Jackson on voir dire, questioning him about his availability for a future trial and asking him if he had provided contact information to the State. (C. 390-92.) Powell's counsel also thoroughly cross-examined Jackson about his extensive criminal history (including his arrests in North Carolina, South Carolina, Georgia, Alabama, and Florida), his history of alcohol and drug abuse,[4] his refusing to meet with Powell's counsel when they came to the jail to talk to him, his circumstances as to how he ended up in the Shelby County jail, and his meeting Powell in the jail. (C. 449-59.) Powell's counsel also questioned Jackson as to why he had been "very uncooperative" with Powell's counsel and asked him about his statement in an interview that he "hate[s] black men." (C. 459-63.) Thereafter, Powell's counsel had the following exchange with Jackson:

---

[4]Jackson told Powell's counsel that he had "tried every drug under the sun just about." (C. 453.)

"[Powell's counsel]: All right. So as part of your interview, you referred, you told the detective that I hate black men. Isn't that correct, sir?

"[Jackson]: I don't hate nobody, sir.

"[Powell's counsel]: So you didn't tell, you didn't say that in that interview that you hate black men? Get me to that, please. Just a second, sir.

"[Jackson]: Okay. And, sir --

"[Powell's counsel]: Sir, your hatred is your cross to bear, not mine.

"[Jackson]: Sir, you wouldn't hate somebody that did you like that?

"[Powell's counsel]: Sir, I don't hate anybody. I don't live with that.

"[Jackson]: I don't hate nobody either. You wouldn't hate a son of a bitch do you like that? All y'all try to do is trick some goddamn somebody, all you sons of bitches.

"The Deputy: Sit down.

"[Jackson]: See what we can fuck that white man out of. I already know. I already know.

"(Video playing.)

"[Jackson]: Been in court all day here. Been in court all day on top of that.

"(Video playing.)

"[Powell's counsel]: That was you, wasn't it?

"[Jackson]: Absolutely.

"[Powell's counsel]: You said you hate black men?

"[Jackson]: The way y'all do me, yes, sir.

"[Powell's counsel]: Well, earlier when I asked you that --

"[Jackson]: The way that man done me, you goddamn right.

"[Powell's counsel]: Earlier when I asked you that, sir, you said you didn't hate anybody.

"[Jackson]: I don't hate nobody --

"[Powell's counsel]: You said you hate him, you hate black men, did you not, sir?

"[Jackson]: He tried to make me look like a goddamn fool. Yes, sir, I do hate you sons of bitches. I said it. There you go.

"....

"[Jackson]: I hate that son of a bitch and I hate your ass, too, because you up here trying to make me --"

(C. 463-65.) Powell's counsel then asked Jackson a series of questions about whether he belonged to "any Neo-Nazi groups," "the Ku Klux Klan," or "any white supremacist groups," and Jackson denied any involvement with those groups. (C. 466.) Powell's counsel also

questioned Jackson about the circumstances surrounding the writing of

the letter. (R. 473-74.) The State did not do any redirect on Jackson.

During a pretrial hearing on the admissibility of Jackson's

deposition testimony, Powell's counsel made the following argument:

> "Finally, the defendant argued that admitting into evidence the deposition testimony of David Jackson would violate the defendant's right under the confrontation clause of the Sixth Amendment to the United States Constitution and Crawford v. Washington, 541 U.S. 36 (2004), case. In support of the defendant's assertion, the defendant offers the excerpts from the written transcription of the video deposition of David Carson Jackson, pages 89 through 104 attached as Exhibit 3 wherein the witness contradicted himself on numerous occasions, expressed a negative racial attitude towards the entire African American race, which does not afford the defendant the guarantees of trustworthiness of his testimony. The defendant respectfully moves that this Court deny the admissibility of all the testimony of David Carson Jackson."

(R. 235-36.) Powell's counsel added:

> "Another thing I wanted to point out this was a case where I believe I was appointed on December 16th or so of 2016 and co-counsel was appointed December 21st of 2016, and this is four years ago. Based on memory, we were like on Christmas break. I don't even know if I was in the office and I received a call saying that they wanted to take a deposition on December 29th during the Christmas break, period. We had no idea what this deposition was about. My client is facing the death penalty in this particular case. So we objected on the record, and we would like to renew that objection to this entire deposition today. My client is facing the death penalty. We prepared as best we could, got back here after Christmas holidays, and I reviewed and co-counsel

reviewed the information that was provided to us from Mr. Jackson, and we were still trying to figure it out and still working on the fly on the 29th. And that is unfair to my client. Your Honor. And it is our contention that this entire deposition process was unfair to our client, the defendant Mr. Michael Powell.

"So in addition to what Mr. Kitt Walker has argued, we would like the Court to make note of how we were working on the fly trying to get information, trying to make a determination as to how to cross examine Mr. Jackson and try to make a determination as to what he said and what was going on concerning this entire matter."

(R. 236-37.)

As to Powell's argument that he was not able to adequately cross-examine Jackson, the circuit court told the parties that it would "defer ruling on the instant motion until I have read the entire deposition." (R. 253.) Ultimately, the circuit court allowed the State to present Jackson's deposition testimony to the jury.

Powell argues on appeal that the circuit court erred when it admitted Jackson's deposition testimony because, he says, his counsel was not given an opportunity to effectively cross-examine Jackson. Powell claims that, because of the timing of his counsel's appointment to his case and the taking of Jackson's deposition, his counsel was "unable to successfully cross-examine Mr. Jackson on his criminal history," did

not have "a chance to hire an investigator," and did not have an opportunity "to review full discovery." (Powell's brief, pp. 23-24.) Powell's argument is without merit.

Although the Sixth Amendment to the United States Constitution provides, in part, that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him," U.S. Const., amend. VI, "'"the Confrontation Clause guarantees only an <u>opportunity</u> for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."' <u>Kentucky v. Stincer</u>, 482 U.S. 730, 739, 107 S. Ct. 2658, 96 L. Ed. 2d 631 (1987) (quoting <u>Delaware v. Fensterer</u>, 474 U.S. 15, 20, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985))." <u>Lane v. State</u>, 327 So. 3d 691, 717 (Ala. Crim. App. 2020). And <u>Crawford</u> sets forth no rule guaranteeing "some minimal threshold of <u>adequacy</u>." <u>Lane</u>, 327 So. 3d at 717.

> "As the United States Court of Appeals for the Fifth Circuit has noted, 'the Supreme Court's watershed decision in <u>Crawford</u> ... did not purport to set forth new standards governing the <u>effectiveness</u> of cross-examination. To the contrary, the Court <u>reaffirmed</u> its precedents holding that "an adequate <u>opportunity</u> to cross-examine" a now-unavailable witness would satisfy the Confrontation Clause.' <u>United States v. Richardson</u>, 781 F.3d 237, 244 (5th Cir. 2015) (first and third emphasis added)."

*Lane*, 327 So. 3d at 717. Here, contrary to his argument on appeal, Powell's counsel was afforded an adequate opportunity to confront and cross-examine Jackson. And, as set out above, counsel conducted a thorough cross-examination, in which counsel highlighted Jackson's extensive interactions with the criminal-justice system, his alcohol and substance abuse, and his feelings about Powell, specifically, and black people, generally.

Because Powell was given an adequate opportunity to cross-examine Jackson, the circuit court did not err when it admitted Jackson's deposition testimony over Powell's objections that it violated the confrontation clause. It is also clear that, as suggested by the judge who offered to preside over the deposition, Jackson's testimony is subject to pretrial objections and could be "redacted" if redaction is considered to be appropriate by the circuit court. Accordingly, Powell is due no relief on this claim.

### III.

Next, we turn to Powell's argument that the circuit court erred when it admitted into evidence surveillance videos from the businesses surrounding the gas station where Algar was murdered because, he says,

41

"the State failed to lay a proper foundation for the authentication and admission of these videos, opening grave doubts regarding 'reliability and trustworthiness' of this evidence." (Powell's brief, p. 34.)

It is well settled that

"'"[t]he admission or exclusion of evidence is a matter within the sound discretion of the trial court." Taylor v. State, 808 So. 2d 1148, 1191 (Ala. Crim. App. 2000), aff'd, 808 So. 2d 1215 (Ala. 2001). "The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court's determination on that question will not be reversed except upon a clear showing of abuse of discretion." Ex parte Loggins, 771 So. 2d 1093, 1103 (Ala. 2000).'"

Floyd v. State, 289 So. 3d 337, 395 (Ala. Crim. App. 2017) (quoting Windsor v. State, 110 So. 3d 876, 880 (Ala. Crim. App. 2012)).

In the context of authenticating a video for admission as evidence in a trial, this Court has explained:

"Rule 901(a), Ala. R. Evid., provides that '[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.' The authentication requirement is a relatively low threshold to meet. '[A]ll that is required under Rule 901' is that the proponent of the evidence make 'a prima facie showing that the [evidence] ... is likely authentic'; the proof of authenticity 'does not [have to] establish beyond a shadow of a doubt the authenticity of the [evidence]' and '"does not have to be conclusive or overwhelming."' Royal Ins. Co. of America v. Crowne Inv., Inc., 903 So. 2d 802, 809 (Ala. 2004) (quoting the Advisory Committee'[s] Notes to Rule 901).

42

See also United States v. McDaniel, 433 F. App'x 701, 704 (10th Cir. 2011) ('We have repeatedly instructed that Rule 901[, Fed. R. Evid.,] sets a low bar for admissibility.').

"With respect to the authentication of videos, the Alabama Supreme Court has explained that '[t]here are two theories upon which photographs, motion pictures, videotapes, sound recordings, and the like are analyzed for admission into evidence: the "pictorial communication" or "pictorial testimony" theory and the "silent witness" theory.' Ex parte Fuller, 620 So. 2d 675, 678 (Ala. 1993). These theories are 'mutually exclusive,' and which theory is applicable 'depends upon the particular circumstances.' Id.

"The pictorial-communication theory applies 'when a qualified and competent witness can testify that the ... recording ... accurately and reliably represents what the witness sensed at the time in question.' Ex parte Fuller, 620 So. 2d at 678. In other words, the pictorial-communication theory applies when a witness who observed what is depicted on the video is available to testify at trial and can testify that the video accurately reflects what the witness observed. See Capote v. State, 323 So. 3d 104, 133 (Ala. Crim. App. 2020) (holding that the pictorial-communication theory was inapplicable because none of the witnesses who testified at trial 'were present at the site while the cameras recorded [the defendant's] activities' (citation omitted)).

"The silent-witness theory, on the other hand, applies when 'there is no qualified and competent witness who can testify that the [video] accurately and reliably represents what he or she sensed at the time in question.' Ex parte Fuller, 620 So. 2d at 678 (emphasis omitted). In such cases, the silent-witness theory provides that a video

"'is admissible, even in the absence of an observing or sensing witness, because the process or mechanism by which the [video] is made ensures

43

reliability and trustworthiness. In essence, the process or mechanism substitutes for the witness's senses, and because the process or mechanism is explained before the [video] is admitted, the trust placed in its truthfulness comes from the proposition that, had a witness been there, the witness would have sensed what the [video] records.'

"Id. Thus,

"'[w]hen the "silent witness" theory is used, the party seeking to have the [video] admitted into evidence must meet the seven-prong Voudrie [v. State, 387 So. 2d 248 (Ala. Crim. App. 1980),] test. Rewritten to have more general application, the Voudrie standard requires:

"'(1) a showing that the device or process or mechanism that produced the item being offered as evidence was capable of recording what a witness would have seen or heard had a witness been present at the scene or event recorded,

"'(2) a showing that the operator of the device or process or mechanism was competent,

"'(3) establishment of the authenticity and correctness of the resulting recording, photograph, videotape, etc.,

"'(4) a showing that no changes, additions, or deletions have been made,

"'(5) a showing of the manner in which the recording, photograph, videotape, etc., was preserved,

"'(6) identification of the speakers, or persons pictured, and

"'(7) for criminal cases only, a showing that any statement made in the recording, tape, etc., was voluntarily made without any kind of coercion or improper inducement.'

"Ex parte Fuller, 620 So. 2d at 678.

"....

"Since Ex parte Fuller, supra, was decided, Alabama cases discussing the authentication of videos under the Voudrie test have dealt almost exclusively with surveillance-camera videos. See Young v. State, 375 So. 3d 813 (Ala. Crim. App. 2021); Capote, supra; Petersen v. State, 326 So. 3d 535 (Ala. Crim. App. 2019); Horton v. State, 217 So. 3d 27 (Ala. Crim. App. 2016); Bohannon v. State, 222 So. 3d 457 (Ala. Crim. App. 2015); Spradley v. State, 128 So. 3d 774 (Ala. Crim. App. 2011); Woodward v. State, 123 So. 3d 989 (Ala. Crim. App. 2011) (dashboard camera from a police officer's patrol car); Straughn v. State, 876 So. 2d 492 (Ala. Crim. App. 2003); Lee v. State, 898 So. 2d 790 (Ala. Crim. App. 2001); Pressley v. State, 770 So. 2d 115 (Ala. Crim. App. 1999); and Ex parte Rieber, 663 So. 2d 999 (Ala. 1995)."

Harrison v. State, [Ms. CR-21-0423, Aug. 18, 2023] ___ So. 3d ___, ___ (Ala. Crim. App. 2023).

Here, the State admitted at trial surveillance videos from businesses around the gas station where Algar was murdered. The State alleged that the videos showed Powell traveling on foot from The View apartment complex where he lived to the gas station and back to The

45

View apartment complex around the time that Algar was murdered. Det. Josh Rauch testified that, as part of the investigation into Algar's death, law enforcement obtained surveillance videos from Wayne's Auto Service, Precision Tune Auto Care, Food Depot, Industrial BP, Faith Consignment, Med Center Shell, Shelby Baptist Medical Center, and The View Apartments. (R. 1412.) Det. Rauch said that he visited each business, viewed the surveillance videos at each business, and saved the videos on a "thumb drive." (R. 1413-16.)

On appeal, Powell raises several arguments about the admission of the above-mentioned videos. We address Powell's arguments on a video-by-video basis.

### III.A. Wayne's Auto Service

As to the surveillance video recovered from Wayne's Auto Service, Powell argues that the State failed to establish that Det. Rauch "was competent to operate" the video-camera system -- i.e., the second Voudrie requirement. (Powell's brief, p. 37.)

At trial, Det. Rauch said that he met with Rhonda Allinder, the office manager for Wayne's Auto, who helped him access the surveillance video. Det. Rauch said that the video showed that at 10:50 a.m. on the

day Algar was murdered "a male subject wearing a white shirt, black pants, appeared to be a black male walking from the left to the right of the screen. He was walking southbound on Highway 31 on the northbound side of the Highway 31 towards Kirkland Chevron." (R. 1417.) Det. Rauch said that the video, which, he said, was "accurate with respect to the actual true date and time," "first picked him up at 10:50 a.m. where this male enters the store at 10:52 a.m., and then four minutes pass and I see the same individual wearing a white shirt, black pants walk out of the Kirkland Chevron and continue southbound on Highway 31 before he takes off into a full sprint." (R. 1417-19.) Det. Rauch said that, after he viewed the video, he downloaded it to his "thumb drive."

Allinder testified that she met with law enforcement about "providing some video in relation to a crime that occurred on October 30th of 2016." (R. 1509.) Allinder said she gave law enforcement access to their camera system and that the officers were familiar with their cameras because of prior thefts at their business. Allinder said that the camera system is "capable of recording what a witness would have seen if they had been present" and that she knows how to operate the system.

47

(R. 1508, 1510.) When the State moved to admit the Wayne's Auto Sales video, Powell raised no objection. (R. 1510.)

Because Powell did not object to the admission of the Wayne's Auto Sales video, Powell's argument on appeal is reviewed for plain error only. After reviewing the testimony in this case, we find no plain error in the circuit court's admission of the Wayne's Auto Sales video based on Det. Rauch's "competence" to operate the surveillance-camera system.

### III.B. Precision Tune Auto Care

As to the surveillance video recovered from Precision Tune Auto Care, Powell argues that "the State introduced [the video] from Precision Tune Auto Care through owner Jamie Martin even though Ms. Martin was unable to verify that the time and date stamps on the video recordings were accurate." (Powell's brief, p 41.)

At trial, Det. Rauch testified that he contacted the owner of Precision Tune Auto Care, Jamie Martin, to view the video. Det. Rauch said that he drove to Martin's house "where she allowed us to view the video" on her laptop computer. (R. 1420-21.) Det. Rauch said that the video showed a "male running out of Kirkland Chevron at 10:56[.] I also see this same individual, black male wearing a white shirt, black pants

48

and I can tell he has a black fedora hat on walking out of the store going southbound in the same direction that I saw him on the Wayne's [Auto Sales] video" and that the male was walking toward the hospital. (R. 1421.) After viewing the video, Det. Rauch "immediately saved it to [his] thumb drive and secured it on [his] person." (R. 1422.)

Martin said that, on October 30, 2016, she telephoned law enforcement after she watched the Precision Tune Auto Care surveillance video "to see what may or may not be" on the cameras. Martin said that the system is "capable of recording what a witness would have seen if they had been present," that she knows how to operate the system, that the video given to Det. Rauch is an "authentic and correct" recording from the system, and that there had been no alterations or changes to that recording. (R. 1493.) Martin testified that she checked the time stamps on the system two or three times per day. (R. 1494.)

When the circuit court first admitted the Precision Tune Auto Care surveillance video, Powell did not object. (R. 1499.) After the court admitted the video, however, Powell argued that Martin "was unable to authenticate the actual time and calibration of the time and when the video was recorded and that type of thing based on [Martin's] testimony."

49

(R. 1500.) The circuit court overruled Powell's late objection, finding that his argument "goes to the weight of the evidence, not the admissibility." (R. 1500.)

Although Powell objected to the Precision Tune Auto Care video on the basis that Martin was unable to "authenticate the actual time and calibration of the time," Powell's objection was untimely because it was raised after the circuit court had already admitted the surveillance video. See Jelks v. State, 411 So. 2d 844, 847 (Ala. Crim. App. 1981) ("It has long been the law in this state that objections to the admission of evidence must be made at the time the evidence is offered, and must state the specific grounds so that the trial court may rule on the matter."). Thus, Powell's argument is reviewed for plain error, and we find none.

Even so, Powell's argument that the State failed to authenticate the time on the Precision Tune Auto Care video is clearly refuted by the testimony presented at trial. Indeed, Det. Rauch testified at trial as follows:

> "[Prosecutor]: Detective Rauch, I wanted to clarify one thing if I could based on your testimony yesterday as I understood it. I believe yesterday afternoon you testified concerning some video footage from Precision Tune Auto. I wanted to ask you was it your testimony that you watched the footage of the person walking in front of Precision Tune Auto

dressed in the dark pants, white shirt and a dark colored hat, that he was heading south?

"[Det. Rauch]: Yes.  That's correct.

"[Prosecutor]: <u>And was the time stamp correct on Precision Tune's video camera system</u>?

"[Det. Rauch]: <u>Yes, it was</u>.

"[Prosecutor]: And what time did Precision Tune's video show for when that person walked in front of their business there?

"[Det. Rauch]: 10:55 a.m."

(R. 1436 (emphasis added).)  What is more, contrary to Powell's argument on appeal and his untimely objection at trial, Martin also testified that she regularly checked the time stamp on the video and that it was accurate.  (R. 1494.)

Because the State presented testimony authenticating the time on the Precision Tune Auto Care video, Powell's argument that it failed to do so is incorrect.  Thus, Powell is not entitled to any relief on this claim.

### III.C.  Food Depot

As to the surveillance video recovered from Food Depot, Powell argues on appeal that the State failed to establish that Det. Rauch "was

'competent' to operate" the camera system at Food Depot -- i.e., the second Voudrie requirement. (Powell's brief, p. 36.)

At trial, Det. Rauch said that he "spoke to a Mr. Robert. He was the manager that was on duty there at the store. Identified who we were and what we needed. He granted us access as to the security system." (R. 1423.) Det. Rauch said that the Food Depot surveillance system was not accurate as to time of day. But to determine the accuracy of the time shown on the surveillance video, Det. Rauch said that they "pulled up the system and looked at what time the computer was telling us, the security system was telling us it was, looked at our phones and verified that it was fifty-four minutes slow." (R. 1423.) Once they determined how far off the system's time was, that allowed them to locate the portion of the video that would show what was happening outside the Food Depot around the time when Algar was murdered. Det. Rauch said that, when they located that time on the system, they watched the video, which showed "the same black male that I have seen from previous videos, black male, white shirt, black pants, black fedora hat walking through the parking lot of Food Depot from the time of 10:47 a.m. until the time of 10:49 walking in the middle of Food Depot parking lot walking towards

Highway 31." (R. 1424.) After viewing the video, Det. Rauch downloaded it to his "thumb drive and secured it on [his] person where [he] later put it into evidence." (R. 1425.)

Robert Schneckenberger, the manager of the Food Depot in October 2016, testified at trial that he met with officers and gave them access to Food Depot's video surveillance system and showed them how to work it but after that he was not involved. Schneckenberger said that the system was capable of seeing what a witness would have seen and that he knows how it was installed, how it functioned, and how to operate the system. (R. 1515, 1517.) Schneckenberger said that the system "had a thirty day lap." (R. 1518.) He "looked at [the video] briefly when [the police] were going through it, but [he] did not spend [any] time on it." (R. 1518.) He allowed the police to use the system and download something, but he could not say that the video admitted into evidence was the item they downloaded and took with them. (R. 1519.)

When the State moved to admit the Food Depot video, Powell argued only, "Objection. Subject to cross." (R. 1516.) The court admitted the video "subject to cross." (R. 1516.) After his cross-examination of Schneckenberger, Powell argued:

"We would like to renew our objection for [the Food Depot video]. [Schneckenberger] doesn't know anything about the recording. He allowed the police to come in and make a recording of something and he doesn't know what happened and didn't deal with the timing of the system, and I don't know that he testified he pushed a button or was in control of the recording."

(R. 1519-20.) The circuit court overruled Powell's objection finding, in part, that Powell's argument "goes to the weight of the evidence, not to its admissibility." (R. 1520.)

In sum, Powell objected to the admission of the Food Depot video on the basis that Schneckenberger lacked knowledge of how law enforcement -- i.e., Det. Rauch -- made the recording of the Food Depot surveillance system video. Powell did not object to Det. Rauch's lack of "competence" to operate the surveillance system. Thus, Powell's argument is reviewed for plain error only. We find no plain error in the admission of the Food Depot video.

### III.D. Industrial BP

As to the surveillance video recovered from Industrial BP, Powell argues that the State failed to establish that Det. Rauch "was competent to operate" the video-surveillance system at the Industrial BP gas station. (Powell's brief, p. 36.)

At trial, Det. Rauch said that a man named Cuong Nguyen helped him access the surveillance video. (R. 1426.) Det. Rauch said that the system's date and time stamp was accurate and that he watched the video around the time Algar was murdered, which showed "the same person that we have been tracking through all the other videos, white shirt, black pants moving from left of the screen to right of the screen still walking southbound on the side of 31." (R. 1426.) Thereafter, Det. Rauch said that he "retrieved it from that system and put it on [his] thumb drive where [he] secured it on my person and went back to the police department and secured it there." (R. 1427.)

Nguyen testified that he knew how to operate the security system at the Industrial BP and that the system was capable of recording what a witness would have seen if they had been present. Nguyen said that he gave officers access to the system so that they could retrieve video from the time of Algar's murder, and that, after showing the officers how to search the video system for what they were looking for, he did not have anything else to do with it. (R. 1522.) He did not view the video with the police. He does "monitor" the system "roughly every other month" and makes sure the "date and time matches with [their] register." (R. 1525.)

When the State moved to admit the Industrial BP video, Powell did not object, and the circuit court admitted the video "subject to cross." (R. 1522.) After he cross-examined Nguyen, Powell argued generally: "We object. It is not authenticated and the foundation wasn't laid." (R. 1528.) The court overruled Powell's objection.

Contrary to Powell's assertion on appeal that there was insufficient evidence to establish Nguyen's "competence" to operate the Industrial BP video-surveillance system, Nguyen did testify that he was the manager of the Industrial BP gas station, that he had worked there for 12 years, that he has "worked on the security system there," that he knew how to operate the system, and that he showed the officers how to search the video system. This was sufficient to establish the second <u>Voudrie</u> requirement that the operator of the recording devise must be "competent."

### III.E. Faith Consignment

As to the surveillance video recovered from Faith Consignment, Powell argues that the video was inaccurate as to time of day and that Det. Rauch "was incapable of establishing the authenticity and correctness of the ... extremely critical time stamps." (Powell's brief, p.

38.) Powell also asserts that there was no testimony establishing "that the recording system at Faith Consignment was capable of recording what a witness would have seen if they had been present." (Powell's brief, p. 39.)

At trial, Det. Rauch said that he met with a person at Faith Consignment who gave him access to the video-surveillance system. Det. Rauch said that the system was not accurate as to date and time, so he had to go through the same process he went through with the Food Depot system. Using that same method, Det. Rauch determined that the Faith Consignment video-surveillance system was off by 1 hour and 26 minutes. Once Det. Rauch figured out this difference, he was able to locate the portion of the surveillance video that showed what was going on outside of Faith Consignment around the time Algar was murdered. Det. Rauch said that the video showed "what appears to be the same individual, white shirt, black pants, black male walking southbound on Highway 31 in the northbound lane. He is only on video for approximately a minute before he turns left and goes up into the parking lot of [Shelby Baptist Medical Center] Hospital parking lot." (R. 1428.) Det. Rauch then downloaded the video to his "thumb drive and secured

57

it on [his] person and took it back to the police department and placed it in evidence." (R. 1430.)

Jill Leath, the owner of Faith Consignment, testified at trial that the business had a video-surveillance system, that she knows how to operate the system, and that around October 30, 2016, police officers came to her business to view the surveillance video from her store. (R. 1501.) Leath said that the video given to Det. Rauch on a thumb drive was "authentic and correct" and that there had been no alterations or changes to that recording. She viewed the thumb-drive video before giving it to the police to make sure it was what they asked for. (1503, 1506.) Leath also explained that the recording was saved on a "backup system for seven days." (R. 1502.)

When the State moved to admit the Faith Consignment video at trial, Powell made the following general objection: "We will object to it at this point. He has not laid the proper predicate." (R. 1503.) The court told Powell that it "will admit" the Faith Consignment video "[s]ubject to cross." (R. 1503.) After Powell's counsel cross-examined Leath, his counsel merely said, "We note the objection." (R. 1507.) The circuit court

58

made no further rulings concerning the admission of the Faith Consignment video.

First, we question whether Powell's general objection that the State failed to lay the proper predicate for the admission of the Faith Consignment video properly preserved for appellate review the specific argument he raises on appeal that the State failed to show the accuracy of the time stamp of the video and that the video surveillance system was capable of recording what a witness would have seen. See, e.g., Foster v. State, 705 So. 2d 534, 539 (Ala. Crim. App. 1997) (holding that "[a] general objection is insufficient to preserve error"), and Todd v. State, 380 So. 2d 370, 372 (Ala. Crim. App. 1980) ("Unless the evidence objected to is patently illegal or irrelevant, an overruled general objection is insufficient to predicate error on appeal."). A review of the record indicates that Powell is correct in asserting that there was no testimony to establish that the recording device used at Faith Consignment was "capable of recording what a witness would have seen" had the witness been present at the time. Because we reverse Powell's conviction on other grounds, we do not have to determine whether this deficiency rises to the level of reversible error.

### III.F.  Med Center Shell

As to the surveillance video recovered from Med Center Shell, Powell argues that "no testimony established" that Det. Rauch "was competent to operate this system" (Powell's brief, p. 37), that the Med Center Shell video was inaccurate as to time of day, and that Det. Rauch "was incapable of establishing the authenticity and correctness of the ... extremely critical time stamps." (Powell's brief, p. 38.)

At trial, Det. Rauch said that he met with Maria Canela, a cashier at the Med Center Shell gas station who assisted him in accessing the Med Center Shell video-surveillance system.  (R. 1430.)  Using the same method that he used for the Food Depot and Faith Consignment videos, Det. Rauch determined that the Med Center Shell video-surveillance system was 1 hour and 31 minutes fast.  After figuring out the discrepancy between the system's time and the actual time, Det. Rauch was "able to cue up an appropriate time frame to look for video footage" and saw what "appeared to be the same individual that we had been watching still walking southbound on 31." (R. 1431.)  Det. Rauch then downloaded the video to his "thumb drive and secured it on [his] person and took it back for evidence." (R. 1432.)

Canela testified that officers came to the gas station and asked if they could access the video-surveillance system. Canela said that the system was capable of recording what a witness would have seen if they had been present, that she knows how to operate the system, and that she provided the officers access to the system. (R. 1529.) On cross-examination, she testified that she looked at the video and saw the police make a copy of it. (R. 1531.)

When the circuit court admitted the Med Center Shell video, Powell did not object. (R. 1529-30.) After Powell cross-examined Canela, he told the circuit court that he "would like to renew [his] objection as to foundation." (R. 1533.) The court overruled his "renewed" objection. (R. 1533.)

Powell did not object when the circuit court admitted the Med Center Shell video into evidence. Powell waited until after he cross-examined Canela to raise any objection to the Med Center Shell video, but, unlike other video-surveillance evidence previously admitted during Powell's trial, this exhibit was not admitted "subject to cross." Therefore, Powell's objection was untimely because it was raised after the circuit court had already admitted the surveillance video from Med Center Shell.

See Jelks, 411 So. 2d at 847 ("It has long been the law in this state that objections to the admission of evidence must be made at the time the evidence is offered, and must state the specific grounds so that the trial court may rule on the matter."). Thus, Powell's argument on appeal is not properly preserved and is reviewed for plain error only. We find no plain error in the admission of the Med Center Shell video.

### III.G. Shelby Baptist Medical Center

As to the surveillance video recovered from Shelby Baptist Medical Center, Powell argues that videos obtained from Shelby Baptist Medical Center were inaccurate as to time of day and that Det. Rauch "was incapable of establishing the authenticity and correctness of the resulting recordings and the extremely critical time stamps." (Powell's brief, p. 38.)

At trial, Det. Rauch testified that he met with Timothy Jones, "who is head of the security" at Shelby Baptist Medical Center. (R. 1439.) After meeting with Jones, Det. Rauch was able to watch the surveillance videos. Det. Rauch explained that the Medical Center's camera "was on three different systems. Basically they had numerous cameras, but they had three different systems and it would operate certain cameras." (R. 1439.) Det. Rauch said that the system was not accurate as to date and

time, and that he had to engage in the same process he used with the Food Depot system. Det. Rauch said that "[c]amera 12 was one hour and thirty-one minutes fast. Camera six was in real-time and the ER camera was one hour and thirty-one minutes fast." (R. 1439.) After figuring out these discrepancies in time, Det. Rauch watched the videos from around the time that Algar was murdered. Det. Rauch said that the "first camera that [he] viewed, [he] saw this individual come up from Highway 31 still walking southbound and walked into the parking lot of the hospital. " (R. 1441.) Det. Rauch said that the person is seen on another camera walking "up the parking deck and then takes a right and walks through the top half or top portion of the parking deck, the parking lot and walks from left to right if you are looking at the hospital walking towards 7th Avenue Northeast." (R. 1442.) Finally, the ER camera showed the person "turn from the hospital and walking up 7th Avenue Northeast." (R. 1443.)

Jones testified at trial that officers came to the hospital requesting access to the video-surveillance system. Jones said that the cameras were capable of recording what a witness would see if a witness had been present and that he knew how to operate the cameras. (R. 1534.) Jones

said that he viewed the videos with the police, that the videos are "authentic and correct" recordings from the cameras, and that there did not appear to be any alterations or changes to the recordings. (R. 1535-36.)

When the State moved to admit the Shelby Baptist Medical Center video, Powell made no objection, and the court admitted the video "subject to cross." (R. 1536.) After his cross-examination of Jones, Powell argued "same objection." (R. 1539.) The court responded, "I will note the objection."

Because Powell did not object when the circuit court admitted the video from Shelby Baptist Medical Center, Powell's objection to the admission of the video after his cross-examination was untimely. See Jelks, 411 So. 2d at 847 ("It has long been the law in this state that objections to the admission of evidence must be made at the time the evidence is offered, and must state the specific grounds so that the trial court may rule on the matter."). Even so, the objection Powell raised after cross-examination was only a general objection. Thus, Powell's argument on appeal was not preserved and is reviewed for plain error only. We find

no plain error in the admission of the Shelby Baptist Medical Center video.

### III.H.  The View Apartments

As to the surveillance video recovered from The View Apartments, Powell argues that the State failed to present testimony that "established the authenticity and correctness of the resulting recording or that no changes, alterations, or deletions had been made to this critical video" (Powell's brief, p. 40) and that the circuit court improperly admitted "a video purportedly depicting the path that a person would walk from Mr. Powell's apartment to one of The View Apartment's security cameras" under the pictorial-communication theory.  (Powell's brief, pp. 40-41.)

At trial, Det. Rauch said that he met with the owner of The View, Dixie Walker, and the manager of The View, Jennifer Jones, who gave him access to the video-surveillance system.  (R. 1446.)  Det. Rauch said that The View's system was seven minutes fast, which he determined by using the same method described above.  Det. Rauch said that the video showed "the same black male that I had been watching in all the previous videos, white shirt, black pants walk from the right-hand side of the screen to the left."  (R. 1446.)  Det. Rauch said the person on the video

65

would be "heading away from the hospital" and toward The View Apartments. (R. 1448.) Det. Rauch said that both Walker and Jennifer Jones identified the person in the video as Powell. Det. Rauch said that he made a copy of the video from The View Apartments and "secured it into evidence." (R. 1448.)

Walker testified that in 2016 she was the chief operating officer for The View Apartments. (R. 1566.) As chief operating officer of The View, she rented apartment 509 to Debbie Harrell, and on June 16, 2016, Powell filled out a rental application and moved into apartment 509 with Harrell. (R. 1566-70.) Walker said that apartment 509 is "downstairs from our office" and that she is familiar with the "path that [Powell] would have taken from [apartment] 509 to get to that dumpster." (R. 1571-72.) Walker said that Powell walked a lot of places and that, the building in which he lived, "when you come out, you go by a little road that has a dumpster on it." (R. 1572.) Walker testified that The View has a "security camera that is across the street from the dumpster" and that "it basically looks at the dumpster and then at the north end of the building at both our office and [the apartment] Michael Powell lived in." (R. 1572-73.)

During Walker's testimony, the State introduced, and the circuit court admitted, as State's Exhibit 60, a video recording showing the path a person would have had to walk to go from apartment 509 to the dumpster located in front of the office to be in view of the security cameras. Walker said that she had viewed the video and that it fairly and accurately depicts the route that Powell would have had to take to get from apartment 509 to the dumpster. (R. 1573.) But Walker said she did not make the video recording that she viewed. (R. 1573.) When the State moved to admit State's Exhibit 60, Powell objected and the following exchange occurred:

> "[Powell's counsel]: We would say the proper predicate has not been laid for admission of this particular exhibit.
>
> "[The State]: Judge, I believe it comes in under the pictorial theory of a video. [Walker] has been able to accurately identify that she knows the path from that apartment to the dumpster, that she has viewed the file and that it does correctly and fairly depict that path.
>
> "The Court: I will overrule the objection. State's 60 is admitted and you may publish."

(R. 1574.)

During Walker's testimony, the State also introduced, and the circuit court admitted, as State's Exhibit 61, four surveillance videos

67

from The View Apartments: one video shows Powell walking away from apartment 509 and walking in front of a dumpster at approximately 7:22 a.m. on October 30, 2016, one video shows Powell walking toward apartment 509 and walking in front of a dumpster at approximately 7:29 a.m. on October 30, 2016, one video shows Powell walking away from apartment 509 and walking in front of a dumpster at approximately 10:27 a.m. on October 30, 2016, and one video shows Powell walking toward apartment 509 and walking in front of a dumpster at approximately 11:19 a.m. on October 30, 2016.  (R. 1579-81.)

Walker testified that the video-surveillance system at The View was "capable of recording what a witness would have seen had they been present" and that she knows how to operate the video-surveillance system.  (R. 1574-75.)  Walker said that, when she watched the four surveillance videos from October 30, 2016, she believed that the person seen walking in each video is Powell.  (R. 1577-78.)  When the State moved to admit State's Exhibit 61, Powell's counsel said, "We would renew our objection."  (R. 1579.)

As noted above, on appeal, Powell argues that the circuit court erred when it admitted both State's Exhibit 60 and State's Exhibit 61.

As to State's Exhibit 61 (the four surveillance videos), Powell argues that the State failed to establish "the authenticity and correctness of the resulting recording or that no changes, alterations, or deletions had been made to this critical video" (Powell's brief, p. 40) But, as set out above, Powell did not raise this specific objection in the circuit court. Instead, Powell made a general objection that he was "renewing" his objection. It is not clear from the transcript of the proceedings what his "renewed" objection related to. Powell's general objection is not sufficient to preserve for appellate review the specific argument he makes on appeal. Thus, Powell's argument as to State's Exhibit 61 is reviewed for plain error only, and, although we agree with Powell that the State failed to satisfy the third and fourth Voudrie requirements as to the surveillance videos from The View, we do not find that these omissions rise to the level of plain error.

As to State's Exhibit 60, Powell argues that the circuit court improperly admitted the video under the pictorial-communication theory. We agree with Powell.

In Spradley v. State, 128 So. 3d 774, 780-82 (Ala. Crim. App. 2011) (quoting Ex parte Fuller, 620 So. 2d 675, 678 (Ala. 1993)), this Court

noted that the key difference between the "silent-witness" theory and the "pictorial-communication" theory for admitting a photograph or video recording is that, to admit a recording under the pictorial-communication theory, the admitting party must present a "qualified and competent witness who can testify that the ... medium accurately and reliably represents what he or she sensed at the time in question." In other words, the witness who lays the foundation for the admission of a recording under the pictorial-communication theory has to have been present at the time the recording or photograph was made. If there is no such qualified witness, the admitting party must rely on the silent-witness theory to have the recording or photograph admitted into evidence. Indeed, the two "theories are mutually exclusive, rather than alternative theories." Spradley, 128 So. 3d at 781. Recently, this Court explained:

> "The pictorial-communication theory applies 'when a qualified and competent witness can testify that the ... recording ... accurately and reliably represents what the witness sensed at the time in question.' Ex parte Fuller, 620 So. 2d at 678. In other words, the pictorial-communication theory applies when a witness who observed what is depicted on the video is available to testify at trial and can testify that the video accurately reflects what the witness observed. See Capote v. State, 323 So. 3d 104, 133 (Ala. Crim. App. 2020) (holding that the pictorial-communication theory was

70

inapplicable because none of the witnesses who testified at trial 'were present at the site while the cameras recorded [the defendant's] activities' (citation omitted))."

Harrison v. State, [Ms. CR-21-0423, Aug. 18, 2023] ___ So. 3d ___, ___ (Ala. Crim. App. 2023).

Here, although Walker testified that she was familiar with what was depicted in the video that was admitted as State's Exhibit 60, Walker testified that she did not make the video. What is more, Walker did not testify that that she was present when the video recording was made. Thus, the circuit court erred when it admitted State's Exhibit 60 under the pictorial-communication theory.

Of course, our finding of error here does not bar the State from seeking to admit State's Exhibit 60 at Powell's retrial for Algar's murder. Indeed, the State may still admit that exhibit under the silent-witness theory or, if it chooses to, under the pictorial-communication theory by presenting a qualified witness who was present when the video was recorded. We also note that, although the circuit court's error is subject to harmless-error review, such a review is unnecessary here because we are reversing Powell's conviction and death sentence on other grounds.

IV.

Finally, we address Powell's argument that the circuit court erred when it "admitted unsigned and unauthenticated letters provided by [Kelvin Hines] in violation of State and Federal law." (Powell's brief, p. 76.) According to Powell, "[t]he State introduced an unsigned letter allegedly written by Mr. Powell that was provided by a jailhouse snitch named Kelvin Hines, who admitted that if he saw an opportunity to get less time for his life sentence he would 'take advantage of it.'" (Powell's brief, p. 77.) Powell claims that the State "failed to establish direct proof that the letter contained Mr. Powell's handwriting: they did not introduce any exemplars of [his] writing for the jury to compare, call a witness who could testify that this was [his] handwriting, or engage a handwriting expert who could provide expert testimony establishing that Mr. Powell wrote this letter or that it was in reply to a previous letter." (Powell's brief, p. 77.) Powell's argument is without merit.

In Capote v. State, this Court addressed the standard used to determine whether a circuit court properly admits a letter allegedly written by the defendant at a trial:

> "'"'The admission or exclusion of evidence is a matter within the sound discretion of the trial court.' Taylor v. State, 808 So. 2d 1148, 1191 (Ala. Crim.

App. 2000), aff'd, 808 So. 2d 1215 (Ala. 2001). 'The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court's determination on that question will not be reversed except upon a clear showing of abuse of discretion.' Ex parte Loggins, 771 So. 2d 1093, 1103 (Ala. 2000). In addition, '[t]rial courts are vested with considerable discretion in determining whether evidence is relevant, and such a determination will not be reversed absent plain error or an abuse of discretion.' Hayes v. State, 717 So. 2d 30, 36 (Ala. Crim. App. 1997)."

"'Gavin v. State, 891 So. 2d 907, 963 (Ala. Crim. App. 2003).'

"Woods v. State, 13 So. 3d 1, 23 (Ala. Crim. App. 2007).

"Rule 901(a), Ala. R. Evid., provides: 'The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.' 'A writing may be authenticated by evidence of the contents or substance of the writing when taken in conjunction with the circumstances out of which it was written.' Charles W. Gamble and Robert J. Goodwin, McElroy's Alabama Evidence § 111.01(1) (6th ed. 2009). See also Rule 901(b)(4), Ala. R. Evid. (providing that a piece of evidence may be properly authenticated by its '[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances').

"In Washington v. State, 539 So. 2d 1089 (Ala. Crim. App. 1988), this Court held:

73

"'"Before a letter is received in evidence, it is necessary to lay a foundation establishing its identity and authenticity, as by introducing proof as to the source of the letter or proof of the handwriting or signature of the sender." Howard v. State, 347 So. 2d 574, 575 (Ala. Crim. App. 1977). Here, there was no proof regarding the defendant's handwriting and the letters bore no signature. Nevertheless, even "unsigned letters may be received in evidence if properly connected with a person as being his actual letter, by the introduction of competent evidence showing it to be so." Silva v. Exchange Nat'l Bank, 56 So. 2d 332, 335-36 (Fla. 1951).

"'The question before us is whether the letters were "properly connected" with the defendant even though no witness saw him write the letters or place them in his truck for delivery. "The authenticity of a letter may be established in more than one way. It may be established directly by proof of handwriting or by indirect or circumstantial evidence." Casto v. Martin, 159 W.Va. 761, 230 S.E.2d 722, 727 (1976); Maynard v. Bailey, 85 W.Va. 679, 102 S.E. 480 (1920); Deaderick v. Deaderick, 182 Ga. 96, 185 S.E. 89 (1936).

"'....

"'Finally, although "the mere contents of a written communication ... are of themselves usually not sufficient evidence of genuineness," 7 Wigmore, Evidence § 2148 at 746, "[t]he contents of a writing may be critical in establishing admissibility. When the contents of a letter are of such nature that the letter could not have passed

74

between any parties except the purported writer and the person to whom it was delivered, the letter is admissible." Casto v. Martin, 230 S.E.2d at 727 (footnotes omitted). See also People v. Adams, 162 Mich. 371, 127 N.W. 354, 360 (1910) (letters purporting to come from defendant to witness, referring to a subject previously discussed by them, were admissible although it was not shown that he signed or sent them).

"'....

"'The sufficiency of the predicate required for the authentication of letters is largely within the discretion of the trial judge, and will be reviewed only for an abuse of discretion. Casto v. Martin, 230 S.E.2d at 727; State v. Huffman, [141 W.Va. 55,] 87 S.E.2d [541] at 554 [(1955)]. We find no abuse of discretion here. The letters were properly admitted for the jury to determine their actual authorship. Maynard v. Bailey, 102 S.E. at 482.'

"539 So. 2d at 1097-99."

Capote, 323 So. 3d at 121-22. Here, the State presented sufficient evidence tending to connect Powell to the letter provided by Hines.

At trial, Hines testified that, while he was in the Shelby County jail, he spoke with Powell about Powell's case. Powell told Hines that there was a picture of him "floating around and it had a picture of a hat," but "you couldn't see his face because the hat was pulled down over his eyes." (R. 2176-77.) Powell also told Hines that there was no way the

75

eyewitness who said that she saw him running down the road "could have identified him driving that fast, the speed limit you had to drive and it was busy." (R. 2177.) Hines said that Powell talked to him about a box that he had that contained .380 ammunition that matched the ammunition found at the crime scene but that Powell said that he had a nephew who was going to tell people that the box and ammunition belonged to the nephew. (R. 2178.) Hines testified that Powell told him that the Chevron gas station where Algar worked had only one camera. (R. 2178-79.) Hines further testified that Powell

> "never specifically said that he shot the lady, but he did say -- he talked about brains. He was talking about her brains or something along the lines of that. And he just -- like I had said, he went on to say there was no way that the blood could have got on him from the way he had the door closed, the way he had the gun stuck in; it was no way."

(R. 2179-80.)

Hines also explained that, in addition to talking to each other about their cases, Powell wrote him letters that were "passed back and forth through the door." (R. 2181.) Hines then identified a letter that, he said, Powell wrote to him while they were in the Shelby County jail, which was admitted as State's Exhibit 292. (R. 2183.) The letter provided:

> "Sorry it took me so long to respond been busy.

76

"Didn't give the devils in the D.A.'s Office my DNA. They've got to use what's already on file and that's what my lawyer told them.

"I'm just sitting & waiting on trial so I can expose the prosecution and detectives as liars with the video footage of me down south. I would like to know the cases you've got that are like mine.

"Glad you got the cases off you (the crack charges)

"Now the point is what are you gonna do? Cop out or go to trial?

"This is a number to stay in contact with me (***) ***-**** My wife # Lady J. My lawsuit has been filed and should be getting served on them soon.

"These inmates need to start filing lawsuits on this jail. The beds are a safety hazard and the new memo on the door is making them have to use the toilet & sink to get on the top bunks which is dangerous.

"Hope you get your biz straight with your snow bunny.

"The Fed inmate over here made the jail give him a free indigent writing package. It had 6 stamps, pen, and paper. Filed a grievance & stated how they're obligated to do that each week for a Fed inmate.

"Whatever decision you make on your case whether to cop out or go to trial. Look at the evidence they claim to have.

"[Illegible]."

(Supp. C. 332-33.) Powell objected to the admission of the Shelby County jail letter, arguing only that "[i]t is not signed by Michael Powell." (R. 2181.)

On appeal, Powell maintains that the letter was improperly admitted because it was "unsigned." He also argues that the State failed to provide any "direct proof that the letter contained Mr. Powell's handwriting" and that the State "failed to establish circumstantial evidence that the letter was written by Mr. Powell." (Powell's brief, pp. 77-78.) Contrary to Powell's arguments, the State presented sufficient evidence connecting Powell to the letter. First, Hines testified that Powell gave him the letter. Further, as quoted above, the letter included the telephone number for "Lady J," who Powell described in the letter as "my wife." During trial, the State presented testimony from Elise Johnson, who testified that she was Powell's girlfriend and that she would talk to Powell on the telephone and communicate with him via text message. Johnson said that, at that time, her telephone number was the telephone number the author of the letter provided to Hines as a means to stay "in contact" with the author. The information related to the telephone number, by itself, was sufficient to connect Powell to the

unsigned letter and, thus, was sufficient to authenticate that letter for its admission at trial. Of course, whether Powell actually authored the letter was a question for the jury to resolve, not a question of the admissibility of the letter. Thus, the circuit court did not abuse its discretion in admitting the letter Hines said was authored by Powell.

Conclusion

Because the State directly commented on Powell's right not to testify during its rebuttal closing argument, this Court must reverse Powell's capital-murder conviction and his death sentence and remand this case to the circuit court for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

Kellum and Minor, JJ., concur in the result. McCool, J., dissents, with opinion, which Windom, P.J., joins.

McCOOL, Judge, dissenting.

I respectfully dissent from the decision to reverse Michael Anthony Powell's capital-murder conviction and death sentence based on Powell's argument that the State directly commented on his failure to testify. I do not believe that the prosecutor's comment was an improper comment on Powell's failure to testify. Instead -- in the context in which it was delivered in this case -- the comment was a proper comment on the evidence, as well as a proper "argument in-kind" by which to rebut defense counsel's comment that the State had failed to produce the murder weapon.

## I. Analysis

Before analyzing the issues in this case, I believe it prudent to set forth the law regarding improper commentary on a defendant's failure to testify. Our jurisprudence in this regard is, and indeed ought to be, extremely fact- and case-specific. Prosecutors are given wide latitude under the law to comment on all reasonable inferences from the evidence, as well as to "argue in-kind" to arguments made by defense counsel. Concerning a prosecutor's comments about the evidence, this Court has stated:

"Questions about the propriety of counsel's statements in closing argument are matters for the broad discretion of the trial court. <u>See, e.g.</u>, <u>Gobble v. State</u>, 104 So. 3d 920, 947 (Ala. Crim. App. 2010) (quoting <u>Acklin v. State</u>, 790 So. 2d 975, 1002 (Ala. Crim. App. 2000)). A prosecutor may argue every legitimate inference from the evidence 'and may examine, collate, shift and treat the evidence in his own way.' <u>Taylor v. State</u>, 666 So. 2d 36, 64 (Ala. Crim. App. 1994). A prosecutor's arguments are to be examined in the context of the complete closing arguments and in the context of the evidence as a whole. The standard of review is not whether the defendant was prejudiced by a comment, but whether the comment 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' <u>Darden v. Wainwright</u>, 477 U.S. 168, 169, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986)."

<u>Woodward v. State</u>, 123 So. 3d 989, 1028 (Ala. Crim. App. 2011). When examining the complained-of comment, the main inquiry is whether the comment was "(1) manifestly intended to be a comment on [the defendant's] failure to testify or (2) … it was of such a character that the jury would have naturally and necessarily taken it to be a comment on [the defendant's] failure to testify." <u>Smith v. State</u>, [Ms. CR-17-1014, Sept. 2, 2022] ___ So. 3d ___, ___ (Ala. Crim. App. 2022).

Furthermore, in our analyses of the comments made in such cases, context is always key. It is a well-known principle of biblical exegesis that "a text without a context is usually a pretext." <u>See e.g.</u>, R. Scott Clark, <u>Any Text Without A Context is Pretext for a Prooftext</u>,

https://heidelblog.net/2010/11/any-text-without-a-context-is-pretext-for-a-prooftext/ (November 30, 2010).[5] Although this principle is theological in origin, the present case is ripe for application of this principle of contextual analysis as well. Indeed, the main opinion purports "to provide context to Powell's argument," ___ So. 3d at ___; however, I believe they ultimately ignore the context, although not for pretextual reasons, and reach the wrong conclusion in doing so. As I will discuss later, I believe the main opinion errs by simply examining the bare statements and comparing them to the bare statements in prior cases, ultimately failing to properly evaluate and weigh the context in which these statements are made. Indeed, as I will argue, our jurisprudence demands that we take a "deep dive" into the context (when available, as in the present case) in which a prosecutor's comments are made in order to determine whether these comments cross the line into improper commentary on the defendant's failure to testify.

    A.    <u>Statements Were Proper Commentary on the Reasonable Inferences from the Evidence.</u>

---

[5]On the date this opinion was released, this document was available online at this web address.

First of all, I believe the context in which these comments were made shows that they were proper commentary on the reasonable inferences from the evidence. In the present case, as set forth in the main opinion, the allegedly improper comments by the prosecutor are: "You know there is only one person in this room who knows where the gun is. One person, he is sitting over there. That guy knows where the gun is. …. There is one man in this courtroom who knows where that gun is, one man and he is sitting right over there next to that jury box." (R. 2395.) When taken in proper context, the prosecutor's comment was clearly a fair comment on the evidence that was presented at trial. See Woodward, 123 So. 3d at 1028 (holding that the prosecutor's argument was not a comment on the defendant's failure to testify because "[t]he prosecutor's comment was directed to the strength of the State's case and to the corresponding weakness in the defense's theory of the case, and it was a fair comment based on the prosecutor's inferences from all the evidence in the case"). Specifically, as set forth in the main opinion, the State presented evidence indicating that Powell convinced another inmate -- David Jackson -- to author a letter confessing to the murder. Part of that letter stated that Powell knew where the gun is. The letter stated: "I

83

apologized to Mr[.] Powell for him being wrongly accused for something that I was involved in. I also told him where to find Mr[.] James Moore's gun." The comment by the prosecutor that Powell knew where the gun was hidden appears to me to be a clear reference to this letter that was admitted into evidence.

Although the main opinion ultimately reaches the wrong conclusion, it does set forth the context surrounding the prosecutor's statements, as follows:

> "At the end of the guilt phase of Powell's trial, the parties presented closing arguments to the jury. The State, in its closing argument, addressed evidence that, it said, showed that Powell had murdered Algar, including clips from the surveillance videos. It also addressed evidence that Powell presented in his defense case and the importance of the David Jackson "confession" letter, which, it alleged, Powell had had Jackson write. (R. 2359-65.) The State also addressed Powell's missing .380 handgun -- the weapon the State alleged was used to shoot Algar -- as follows:

>> "'Now, the gun disappeared. The silver box hidden under [Powell's girlfriend's] house, bullets in it matching the description of the bullets that were found and used to kill Tracy Algar. When he was caught, he began running to alibi after alibi. When that didn't seem to be working, he ran to David Jackson, scheming to move this and shift the blame.'

> "(R. 2365-66.)

84

"In his closing argument, Powell's counsel argued:

 "'Now, the judge has charged you that a defendant has a right to remain silent. Michael exercised his right to remain silent in this particular case. You swore that you would not hold that against him. That is what we are going to ask you to do right now. You heard the evidence. You heard things that are going on in this case, but we are going to ask you to not hold it against Michael Powell because he exercised his right to remain silent that we all have.'

"(R. 2369-70.) Powell's counsel then addressed the weaknesses in the State's evidence and questioned the usefulness of the surveillance videos that the State had presented to the jury. Powell's counsel also addressed the .380 ammunition and the lack of evidence linking Powell to the murder as follows:

 "'There is a .380 caliber Winchester spent shell found in the store after individuals went in the store and before the store was roped off, but they even checked that. No fingerprints, no DNA belonging to Michael Powell. They lifted fingerprints off of the silver box, no DNA, no fingerprint lifts belonging to Michael Powell. They lifted DNA and fingerprint lifts off of the live rounds that were in the box, no DNA, no fingerprint lifts connecting Michael Powell.

 "'There is doubt all over the place, DNA, ballistics, no gun. Misidentification problems.'

"(R. 2386-87.)

"The State, in its rebuttal argument, addressed the missing gun, telling the jury: 'You know there is only one

person in this room who knows where the gun is. One person, he is sitting over there. That guy knows where the gun is.' (R. 2393-94.) Powell's counsel objected to the State's argument, and the following exchange occurred outside the presence of the jury:

> "'[Prosecutor]: If I could. Your Honor --

> "'The Court: Can you finish the thought?

> "'[Prosecutor]: It is within the David Jackson letter that David Jackson told him where the gun is.

> "'The Court: You are afraid he is headed for comment on --

> "'[Powell's counsel]: It is not in the possession of --

> "'The Court: I think that is what the objection is, yes?

> "'[Powell's counsel]: Yes, sir.

> "'The Court: He hadn't finished his --

> "'[Powell's counsel]: I didn't want him to finish. I thought it was improper.

> "'The Court: Tell them what you are fixing to say.

> "'[Prosecutor]: The David Jackson letter says that David Jackson told him where the gun is. That is it, I am not going to say he didn't tell us or anything like that. I am not a first-year prosecutor, but I appreciate the instruction.

"'The Court: That bell hasn't been rung yet. I don't find that to be improper depending on what comes next of course. We will resume.

"'(End of side-bar.)

"'The Court: [Prosecutor], you may continue.

"'[Prosecutor]: Thank you, Your Honor. <u>There is one man in this courtroom who knows where that gun is, one man and he is sitting right over there next to that jury box</u>. You remember that letter from David Jackson? I have one copy here. State's 1001. You have the original, State's Exhibit 223.

"'[Powell's counsel]: I still renew my objection.

"'The Court: Noted, overruled.

"'[Prosecutor]: This letter, I am on page three for reference, 'I apologize to Mr. Powell for him wrongly -- for him being wrongly accused for something that I was involved in, I also told him where to find Mr. James Moore's gun.' That is what David Jackson said. That is what David Jackson copied from the defendant's letter. Do you remember him telling us about that?"

"(R. 2394-96 (emphasis added).)"

<u>Powell</u>, ___ So. 3d at ___ (footnote omitted).

This context demonstrates that the State was not commenting on the failure of the defendant to testify; rather, the State was arguing the

reasonable inferences from the evidence. Powell cannot arrange for someone to write a bogus confession letter that states that Powell knows where the gun is and then prohibit the State from commenting on that evidence during closing argument. The context here establishes that the prosecutor's argument was a fair comment on the evidence; therefore, it was not manifestly intended to be a comment on Powell's failure to testify and the jury would not have naturally and necessarily taken it to be a comment on Powell's failure to testify.

### B. Statements Were Proper "Argument In-Kind."

Secondly, I believe the context shows that the prosecutor's comments were "argument in-kind," responding properly to the defense attorney's arguments. Specifically, Powell's counsel stated: "There is doubt all over the place, DNA, ballistics, no gun. Misidentification problems." (R. 2387) (emphasis added). I believe the prosecutor had the right to "argue in-kind" by responding that Powell knows where the gun is, much like the prosecution in Mitchell v. State, 84 So. 3d 968 (Ala. Crim. App. 2010). In Mitchell, the defendant, who had been convicted of capital murder and sentenced to death, argued that the prosecutor improperly commented on his failure to testify during the guilt

phase. Specifically, the defendant alleged that the following comments were improper: "No gun. We don't have a gun. Where is the gun? I don't know. He knows. He knows where the gun is." Mitchell, 84 So. 3d at 979. In substance, the prosecutor's comments in the present case and the prosecutor's comments in Mitchell are exactly the same. However, in Mitchell, this Court held that the comments did not constitute an impermissible reference to the defendant's failure to testify, specifically holding:

> "To the extent Mitchell asserts that the prosecutor commented on his failure to testify when the prosecutor stated that Mitchell knew where the murder weapon was located, this argument is without merit. Contrary to Mitchell's assertion, the prosecutor's comments were not made in an attempt to draw attention to the fact that Mitchell had not testified. Instead, the prosecutor was simply responding to defense counsel's argument that the State had failed to meet its burden of proof because it had not produced the murder weapons. Cf. Ballard v. State, 767 So. 2d 1123, 1135 (Ala. Crim. App. 1999) ('A prosecutor has a right to reply in kind to the argument of defense counsel. This "reply-inkind" doctrine is based on fundamental fairness.'); Harris v. State, 2 So. 3d 880, 920 (Ala. Crim. App. 2007) (same); Brown v. State, 11 So. 3d 866, 903 (Ala. Crim. App. 2007) ('Where a matter has been gone into by one party to a cause, the other party has the right to explain away anything, if he can, that may have been brought out to his detriment.') (citations and quotations omitted). Reviewed in context, this statement was 'not manifestly intended or was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.' Gavin [v. State], 891 So.

2d [907,] 981 [(Ala. Crim. App. 2003)]. On the contrary, this comment simply relayed the message that law enforcement had not recovered the murder weapons because Mitchell had disposed of them. Consequently, the prosecutor did not improperly comment on Mitchell's failure to testify."

Mitchell, 84 So. 3d at 980.

The main opinion in the present case, on the other hand, relies on Whitt v. State, 370 So. 2d 736 (Ala. 1979), in which the Alabama Supreme Court held that the prosecutor's comment was an impermissible direct comment on the defendant's failure to testify. The main opinion finds that the comments in the present case "are nearly identical to the comment made by the prosecutor in Whitt." ___ So. 3d at ___. The main opinion then states that the comment in the present case, like the comment in Whitt, "is clearly a direct comment on Powell's failure to testify at trial." ___ So. 3d at ___.

I disagree, however, with the main opinion's assertion that the comments in the present case are "nearly identical" to the comments in Whitt. The comment in Whitt that was held to be an improper comment regarding the defendant's failure to testify was "[t]he only person alive today that knows what happened out there that night is sitting right there." Whitt, 370 So. 2d at 737. Unlike the comments in the present

90

case, the comment in <u>Whitt</u> did not talk about a gun or any other specific piece of evidence but instead referenced generally the fact that there was no living witness besides the defendant. Thus, contrary to the assertion in the main opinion, the comments in the present case are not "nearly identical to the comment made by the prosecutor in <u>Whitt</u>." More importantly, the Supreme Court in <u>Whitt</u> did not have any context for the prosecutor's comments, and for this reason especially I question the main opinion's heavy reliance on <u>Whitt</u> in its analysis of the prosecutor's comments in this case. In fact, the <u>Whitt</u> Court stated that the record was <u>completely devoid</u> of context, as follows: "It seems self-evident that it cannot be 'argument in kind' when we do not have the defense counsel's argument to which this comment is said to reply. The record does not contain the closing arguments in this case." <u>Whitt</u>, 370 So. 2d at 738. The clear implication of that statement is that if the Court had had context in that case, the result might have been different.

I believe that we should view <u>Mitchell</u>, rather than <u>Whitt</u>, as more determinative to the outcome of the present case. In the present case, "[t]he prosecutor's comments were not made in an attempt to draw attention to the fact that [Powell] had not testified. Instead, the

91

prosecutor was simply responding to defense counsel's argument that the State had failed to meet its burden of proof because it had not produced the murder weapon[]." See Mitchell, supra. Furthermore, "reviewed in context, this statement was 'not manifestly intended or was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.' Gavin, 891 So. 2d at 981. On the contrary, this comment simply relayed the message that law enforcement had not recovered the murder weapon[] because [Powell] had disposed of [it]. Consequently, the prosecutor did not improperly comment on [Powell]'s failure to testify." See Mitchell, supra. [6]

## II. Conclusion

Finally, let me reemphasize my belief that context is crucial to any analysis of allegedly improper comments on the defendant's failure to testify. As I have already stated, any such analysis must necessarily be

---

[6]I note that there was no objection in Mitchell, so plain error would have been applicable, but this Court did not simply hold that the prosecutor's comments did not rise to the level of plain error. Instead, this Court held that the defendant's argument was "without merit," and this Court unequivocally stated that "the prosecutor did not improperly comment on Mitchell's failure to testify." Thus, the lack of an objection in Mitchell is not relevant to the present case.

fact- and case-specific. Unfortunately, at least from my perspective, rather than engaging in an in-depth analysis of context, the main opinion merely compares the bare statements in the present case to the bare statements in <u>Whitt</u> and pronounces that the comments in the present case are impermissible commentary on the defendant's failure to testify simply because they are "nearly identical." To put it another way, rather than delve into a deeper contextual analysis in the present case, where we <u>do</u> have the context of the prosecutor's comments, the main opinion simply compares statement to statement, and I believe in doing so gets it wrong. I believe this approach ignores the context-driven holding of <u>Whitt</u> and leads to an improper result in this case.

Because I believe that, in the context of this case, the prosecutor's comment is not an improper comment on Powell's failure to testify but instead is a proper comment on the evidence and a proper "argument in-kind" to rebut defense counsel's comment that the State had failed to produce the murder weapon, I must respectfully disagree with the main opinion. I do not believe that these statements were "(1) manifestly intended to be a comment on [the defendant's] failure to testify or (2) of such a character that the jury would have naturally and necessarily

taken [them] to be a comment on [the defendant's] failure to testify."

Smith v. State, [Ms. CR-17-1014, Sept. 2, 2022] ___ So. 3d ___, ___ (Ala. Crim. App. 2022).

Based on the foregoing, I respectfully dissent.

Windom, P.J., concurs.